**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | |
|---|---|
| **W.C. BRADLEY CO.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 17-CV-00208** |
| **ITELLIGENCE, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## AMENDED COMPLAINT

Plaintiff W.C. Bradley Co. ("WCB" or the "Company"), for its amended complaint against Defendant itelligence, Inc. ("itelligence"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This action arises from the fraud and other misconduct of itelligence in misrepresenting its skills and experience and the suitability of a software solution to obtain a multi-million dollar contract to upgrade the global computer systems of WCB, a family of companies primarily focused on home and leisure products and services.

2.      From its formation in 1885, WCB's development has been marked by growth, diversity, and profitability.  In 2014, as a result of years of global expansion and as a critical part of its global growth strategy, WCB decided to consolidate its multiple information technology ("IT") systems to run on a single, integrated enterprise resource planning ("ERP") software platform that could meet WCB's business needs, on an enterprise-wide basis, and support its continued growth (the "Project").

3.      Given the extraordinary operational risks in replacing its dated, disparate core IT systems – and because WCB had no prior experience implementing a global ERP system – WCB

knew that it had to rely on a software consulting firm to provide the necessary resources, skills, and experience to lead, manage, and deliver the implementation.  To that end, WCB undertook a rigorous due-diligence ERP selection process, during which it worked closely with various vendors to ensure that it would select the appropriate ERP system and retain an appropriately skilled and experienced consulting firm to successfully implement it.

4.      Even though WCB operates multiple business units, located in different countries, with different business requirements, itelligence insisted that WCB did not need a customized software solution.  Instead, after spending months learning about WCB's business processes and functional needs during the pre-contract sales presentations and pre-contract due diligence, itelligence represented that its "global template" solution was appropriate for WCB.  Assuring WCB that itelligence was familiar with and understood WCB's business, itelligence aggressively touted its rapid deployment, global template solution as the best software solution to run WCB's core business processes.  Moreover, itelligence represented that, using itelligence's global template solution and relying on itelligence's "knowledge transfer" from its consultants to WCB's IT personnel, WCB would be "self-sufficient" after the first go-live, and that WCB would be able to lead subsequent rollouts to its other business units with minimal assistance from itelligence.  itelligence falsely assured WCB that this rapid deployment, global template solution, when combined with its knowledge transfer to WCB, would allow WCB to have a global ERP system implemented in a matter of months.  itelligence also falsely represented that it had the necessary skills and experience to deliver an on-time and on-budget global ERP solution that would meet WCB's business needs.  itelligence made these misrepresentations to induce WCB into retaining itelligence for the Project, which it did.

5. Contrary to itelligence's pre-contract representations, the global template solution was woefully unsuited to WCB's business, and could not provide crucial functionality that WCB needed to run its core business processes, nor could it streamline subsequent implementations to WCB's different business units.

6. In addition, itelligence knew when it made the false representations that it lacked the resources and experience necessary to deliver a successful ERP implementation for a company of WCB's size and complexity. itelligence also knew, or should have known, that the level of software customization required to perform the implementation to meet the Company's functional needs far exceeded the effort it was capable of delivering at the cost it proposed. To the contrary, itelligence rewarded WCB's trust and reliance with a reckless indifference to WCB's needs, providing WCB with incompetent and inexperienced consultants who implemented a deficient system that caused severe damage to WCB's business. itelligence's incompetent consultants not only made numerous design, configuration, and programming errors, but they also failed to properly manage the Project and adequately identify, manage, and mitigate Project risks.

7. Moreover, throughout the Project, itelligence intentionally or recklessly failed to disclose to WCB critical risks that threatened the implementation. Intent on meeting projected go-live dates, itelligence ignored the input of WCB employees uniquely familiar with WCB's business processes. Moreover, to conceal the system's defects and functional gaps, itelligence conducted inadequate and truncated testing and instead recommended that WCB proceed with the scheduled go-lives. By obstructing WCB's discovery of the truth, itelligence was able to extract additional payments from WCB for work that was deficient, incomplete, or not performed.

8.      Contrary to itelligence's repeated assurances that the global template solution was appropriate for WCB, the system go-lives were disastrous.  Among other crippling problems, the system could not manage or report available inventory, invoice customers correctly, or print critical labels and business forms, basic required functionality needed to operate WCB's daily business.

9.      The result of itelligence's fraud and other misconduct was a failed software system that was defectively designed, deficiently installed, incapable of operating WCB's fundamental business processes, and still has yet to be fully implemented throughout WCB's business.  WCB has sustained tens of millions of dollars in damages, as well as injury to its customer relationships and reputation, and one of WCB's profitable business units has operated at a loss every year since implementation of itelligence's defective software system.  itelligence, meanwhile, has already pocketed over $20 million in fees from WCB for a systems implementation project it mismanaged and was unable to perform properly.  Incredibly, itelligence is now seeking to profit from its misconduct by demanding millions of dollars in additional fees to continue to implement a flawed system using defective and deficient methodology and practices.

## PARTIES

10.      W.C. Bradley Co. is a privately owned corporation with its headquarters located at 1017 Front Avenue, Columbus, Georgia 31902.

11.      Upon information and belief, itelligence Inc. is a wholly-owned subsidiary of NTT Data with its principal corporate office located at 10856 Reed Hartman Highway, Cincinnati, Ohio 45242.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. § 1332 based on the diversity of citizenship of the parties and because the amount in dispute, excluding interests and costs, exceeds $75,000.

13.    Venue is proper in this district pursuant to U.S.C. § 1391 because itelligence's fraudulent and other misconduct took place in this district.  In accordance with Georgia's long-arm statute, O.C.G.A. § 9-10-91(1), this Court has personal jurisdiction over itelligence, a corporation that does business in the State of Georgia.

## FACTUAL BACKGROUND

**A.    WCB's Business and the Decision to Implement a Global SAP System**

14.    Founded as a "cotton-factoring" business in 1885, WCB has had a rich company heritage spanning diverse businesses across multiple industries.  Today, WCB is a holding company that is comprised in part of the following families of companies focused on home and leisure products and services:  (i) Char-Broil, LLC (outdoor cooking) ("Char-Broil"); (ii) W.C. Bradley/Zebco Holdings Inc. (fishing tackle and outdoor gear) ("Zebco"); and (iii) Lamplight Farms Incorporated (outdoor torches, torch fuel, lamps, and related products) ("Lamplight"). The W.C. Bradley Co. Real Estate ("WCB Real Estate") has also been a leader in real estate development in the Columbus, Georgia area for over 50 years.  WCB has maintained its headquarters in Columbus, Georgia since its formation.

15.    In recent years, WCB's development has been marked by growth, diversity, and profitability.  Over the last decade, WCB expanded domestically and internationally, including through acquisitions in Germany, the United Kingdom, and Denmark, and a joint venture in Australia.  As a result of this expansion, however, WCB operated with several business

processes across numerous technology platforms.  This complex and cumbersome structure posed significant technical risks, running on aging infrastructure platforms, often with limited or decreasing support.  These fragmented business processes resulted in significant constraints and limitations on WCB's growth.

16.     Guided by the recognition that its current disparate systems, with their functional limitations, would impede the Company's ability to achieve its strategic goals, WCB began exploring the option of performing a global systems upgrade in early 2014 by replacing its disparate and aging software systems with a single ERP system.  This global ERP solution was intended to eliminate reliance on outdated legacy applications and other technology systems that were highly customized and no longer supported, as well as to replace manual processes with updated, automated ones.

17.     WCB treated the global ERP platform as the crucial component of a strategic program to support future growth, improve efficiencies, and retain and expand its market share in home and leisure products.  With a global ERP platform, WCB would have access to a single, consolidated view of operations and finances.  WCB's vendors and partners would additionally benefit from a global view of inventory as they managed the purchase/order/shipment and quality processes.  The new ERP system would provide dynamic business analytics and real-time reporting, accommodate multi-currency, multi-lingual, foreign tax, and other international regulatory requirements that are inherent in a global business operation.  The global ERP platform would also support WCB's strategic plan for continued expansion through organic growth and potentially further acquisitions by streamlining post-acquisition process integration.

18.     In light of its complex functional business requirements related to, among other things, business analytics, financials, tax, and currencies, and because its in-house information

systems group did not have prior ERP implementation experience with a global solution, WCB determined it was imperative to engage outside consultants that had the requisite highly specialized skills and experience to design and manage the Project.  More specifically, WCB needed to engage outside consultants with the ability and intention to staff the Project with consultants who had:  (i) sufficient expertise to understand the financial, tax, reporting, and other requirements applicable to WCB; (ii) a mastery of the ERP solution selected for the Project; (iii) the skills, experience, and expertise to apply best practices to appropriately blueprint, design, and test the ERP solution to meet WCB's functional needs, and (iv) the skills, experience, and expertise required to manage a global ERP implementation the size and complexity of the Project.  Additionally, WCB had determined that the nature of its global business, the existing revenue stream, and the growth projections required a Tier 1 ERP software platform to support its strategic initiatives.

19.    At the start of 2014, WCB assembled a team (the "Selection Team") staffed with business leaders, executive sponsors, and subject matter experts representing all of its business units to review proposals from, attend meetings with, and observe demonstrations by the competing candidates.  Recognizing that the success of the Project depended on both the suitability of the ERP software product for WCB's business, and also on the capabilities of the consultants it selected to implement that software, WCB engaged in a rigorous ERP software and systems integrator selection process.

**B.    itelligence's Campaign to Land the Implementation Contract
by Misrepresenting Its Skills and Ability to Deliver the Required System**

20.    After having spent several weeks investigating and compiling the business needs for each of WCB's businesses, including through discussions with business leaders about how a new ERP system could best support further growth, in or around April 2014 the Selection Team

began speaking with different Tier 1 ERP software providers about the available software, including SAP AG ("SAP").  SAP recommended that WCB partner with itelligence to design and implement an SAP system suitable for WCB's business needs.

21.    Throughout May, June, and July of 2014, WCB had the Project candidate vendors, including itelligence, participate in on-site presentations to demonstrate their respective software solutions to the Selection Team.  During this time, itelligence was given the opportunity to conduct a detailed study of WCB's software systems and business processes within each business unit, and to participate in extensive information-gathering sessions with WCB employees.  Through this extensive process, itelligence was able to acquire an in-depth understanding of WCB's ERP solution requirements by interviewing key personnel, observing critical business processes, and learning about the Company's existing software system. Additionally, itelligence had the opportunity to respond to questions from WCB employees about its proposed software system capabilities and implementation services, and represented that itelligence could – and would – meet WCB's business needs.  During these information sessions, itelligence also learned about WCB's staff limitations.  itelligence Senior Account Executive, Rick Baron, was present throughout this period of discovery, and was an active participant in all discovery sessions.

22.    Following these preliminary discovery sessions, WCB issued a Request for Proposal ("RFP") on July 22, 2014 inviting vendors, including itelligence, to submit their respective plans for a global enterprise solution that met WCB's functional and technical requirements.  The RFP clearly set forth the evaluation criteria for the selection of an ERP solution implementation partner, which included the vendor's ability to execute delivery of a global system.

23.     WCB sought a "[p]roven team" equipped with "implementation tools & talent" and "[p]roven experience across the globe," specifically related to regional financial requirements, tax, and international currencies.  As set forth in the RFP and of paramount importance to WCB was the selection of an "enterprise solution partner" that would manage the implementation effort and have "full responsibility for the successful implementation of the system."  WCB further disclosed that it wanted a partner who had "proven ability . . . to execute," and requested "proof of ability to recruit and retain experienced resources."  WCB plainly disclosed that it had "diverse businesses" and was "continuously growing."

24.     On or about August 7, 2014, itelligence responded to WCB's RFP.  In an 82-page written response, itelligence acknowledged the "importance of this evaluation process" to WCB and proposed an SAP-based enterprise solution that "exceeds W.C. Bradley Co.'s functional and technical requirements."  itelligence represented that it was a "Global Systems Integration firm" with "deep expertise" and "proven delivery methods" that "focused exclusively on the SAP suite of products."

25.     Concerning itelligence's purported skills, experience, and expertise in SAP software, its qualifications to act as WCB's enterprise solution partner, and its commitment to WCB, itelligence represented in writing to WCB the following:

- "itelligence brings deep SAP, Wholesale Distribution and CPG Industry, Master Data Management and Integration skills supported by tools and itelligence Proprietary Items (iPI) to accelerate the implementation."

- "We have the needed experience, relationships and leverage to have combined project plans under itelligence PMO Leadership."

- "We will work to ensure that we bring the most qualified resources with consideration to W.C. Bradley Co.'s culture and team chemistry."

- "The resource mix and tool sets included in this RFP response are focused to drive the greatest benefits to W.C. Bradley Co., while mitigating complexity and business risks with a fully integrated solution."

- "With itelligence, you get a partner with global, regional and local capacities and competences [sic]."

- "…deep understanding of specific regional and local requirements."

- "…itelligence's deep expertise enable [itelligence] to Co-Innovate with W.C. Bradley to deliver on both SAP and Industry Best Practices and Global Template requirements."

- "…our proposed solution will meet your organizations' requirements today and serve as a flexible, scalable and stable platform for innovation and growth."

- "…depth of expertise in Global Templates to ensure ease of roll out and acquisition integration."

- "…the right mix of consulting resources that bring the combination of **industry** and SAP **product** expertise."

- "partner with W.C. Bradley to drive an effective program that is both on time and [on] budget."

- "We have the needed experience, relationships and leverage to have combined [Third Party Products] project plans under the itelligence PMO Leadership."

26.     In response to questions regarding "Vendor's Ability to Execute," itelligence proposed to assume a "Program Accountability" role on the Project, acting as the "Prime Vendor to ensure program accountability" and "mitigating the risk of W.C. Bradley Co. having to manage multiple vendors."  itelligence also touted its implementation approach "to deliver Self-Sufficiency at the conclusion of projects" and further represented that its "Highly Qualified" team members could support, among other things, the "knowledge transfer and training needs required to deliver W.C. Bradley Co.'s Global SAP Solution."  itelligence represented that "[o]ur knowledge transfer process is the key" to their success.

27.     WCB also received RFP responses from other vendors, proposing different software solutions.  After thorough analysis of the RFP responses received from itelligence and two other vendors, WCB invited all three vendors to a day of onsite demonstrations in August

2014, highlighting the software offerings of each proposed solution.  itelligence presented an

onsite demonstration of its SAP solution in Char-Broil's office in Columbus, Georgia, on August

22, 2014.  itelligence attendees included Baron, and the WCB selection team included Terry

Bargy, WCB's Chief Information Officer.  itelligence also brought consultants to demonstrate

the proposed SAP solution – so-called "pre-sales engineers" – who were then never seen again

and never worked on WCB's SAP system.  itelligence used the demonstration to mislead the

WCB Selection Team and convince them that itelligence had the skills and experience necessary

to easily customize the SAP solution to enable it to meet WCB's functional needs and business

requirements, and to falsely represent that the global template solution would be suitable for

WCB's business units, and would ultimately save WCB time and money.  During this

demonstration, itelligence repeatedly represented that it had the experience and expertise to

deliver an SAP solution with less effort and expense than competing ERP vendors through the

use of a global template.

      28.     Following the onsite demonstration, WCB expressed concern about the proposed

price of itelligence's implementation services.  Desperate to induce WCB to sign a multi-million

contract, itelligence embarked on a scheme to ostensibly reduce the price of itelligence's services

through a series of false representations in order to induce WCB to engage itelligence.

itelligence proposed that WCB could split the global implementation of its business units into

two phases.  Phase 1 would include the creation of the global template and implementation for

Zebco, WCB Real Estate, and WCB's corporate operations ("WCB Corporate"), and Phase 2

would roll out the SAP solution to WCB's remaining business units, Char-Broil and Lamplight.

itelligence would lead the implementation for Phase 1, and, by the conclusion of Phase 1,

itelligence would complete a "knowledge transfer," handing over the global template and

training WCB to lead the purportedly less complex rollout of Phase 2 for significantly less

money.  Beginning in August and continuing through December, itelligence made a series of

representations – both in written correspondence and orally during phone conferences and in-

person meetings – concerning the feasibility of this new, two-phased implementation proposal.

29.     itelligence knew that WCB needed a customized solution to address its complex

business requirements, yet knowingly misrepresented to the Company that WCB could save time

and money by utilizing itelligence's pre-configured template solution with phased rollouts to the

different business divisions.  Once retained, itelligence would be able to upsell additional

customization to the pre-configured template to address functionality gaps in the template

solution.  Additionally, itelligence knew that WCB did not have sufficient prior SAP experience

to implement a global system.  Once retained, itelligence would be able to collect more money

than budgeted for Phase 2 when it became apparent that WCB was not capable of implementing

the SAP solution on its own.

30.     itelligence's quoted timeframes and costs were never realistic given the

complexity of WCB's organization, the inappropriate fit of itelligence's pre-configured template

solution, and WCB's inability to implement an SAP system on its own.

31.     itelligence repeatedly assured WCB that a template would not only be appropriate

for the Company's business model, but also could be rolled out more easily to the various

business divisions in a phased implementation.  itelligence represented that by developing a

template of similar functionality, it could reduce the cost of implementing the SAP system to

new regions and new divisions within WCB.  However, unbeknownst to WCB, this template

approach only works where a company has a high degree of commonality between regions and

divisions.  WCB's businesses do not have a high degree of commonality of procedures.  For

example, each business sells a unique product catalogue, operates using separate financial systems, and utilizes different methods to ship, deliver, and produce products in different countries.  Even within the same business unit, different countries require different business processes.  itelligence knew that the template solution it was proposing required significant configuration and customization to meet WCB's business requirements, but did not disclose this fact to WCB.

32.     In dozens of conversations and written communications beginning in August 2014 and continuing through December, itelligence's Baron, Darshan Shah (Senior Vice President), and Doug Thacker (Director of Project Delivery) repeatedly told members of WCB's Selection Committee, including Bargy and Tia Justice (Senior Manager IT Business Applications), that "all you need is knowledge transfer" (which Baron, Shah, and Thacker represented itelligence would deliver at the appropriate time in the Project) and the global template, and that the "rest is just localization" at each business unit, easily accomplished by WCB with minimal support from itelligence.  itelligence represented that, with itelligence's knowledge transfer, WCB would attain "Self-Sufficiency by the start of Project 2."  When WCB's Justice expressed concerns about the proposed cost given the complexities of WCB's business structure, Shah reassured her in a December 5 email that "[i]t will not have a significant impact on efforts."  itelligence consultants – including Baron, Shah, and Thacker – repeated these representations to the WCB Selection Team at an in-person meeting on December 1, 2014 at WCB's Columbus, Georgia headquarters.  Baron told WCB's Justice in a December 3 email that itelligence would provide "the best solution possible" to WCB.

33.     itelligence also misrepresented the suitability of certain of itelligence's "proprietary products."  WCB had expressed concerns during the last quarter of 2014 that it did

not have a large enough electronic data interchange (or "EDI") team to handle that aspect of the Project.  Baron told Bargy in person and in writing throughout the last quarter of 2014 that its proprietary EDI product would drastically cut the time needed to map data migrations to SAP, saving WCB thousands of hours and substantial amounts of money.  In a November 4 document prepared by Baron and delivered to, among others, Bargy, intelligence represented that its EDI tool is a "program accelerator" that would "reduce the effort and ensure that the EDI Team can successfully meet the requirements of the implementation."  What intelligence knew, and failed to disclose to WCB, is that this EDI product had never before been used for anything other than grocery businesses, and was inappropriate for 90% of WCB's business requirements.

34.     In addition to the foregoing representations concerning the appropriateness of its global template and the effectiveness of the "knowledge transfer," intelligence made numerous misrepresentations to WCB during the selection process related to intelligence's purported skills, experience, and expertise.  The same intelligence executives – Baron, Shah, and Thacker – represented that intelligence had the ability to work across the globe with a "seamless integration" of their team with WCB's team, that the "breadth and depth" of the intelligence team would deliver a successful SAP system.  In an October 4 email, Baron told Bargy that intelligence's warehouse management consultants were "well regarded" by other clients, and again told Bargy, Justice, and WCB's Anthony Nesbitt (Senior IT Manager) in a November 5 email that intelligence consultants have the "ability to execute" the "Low Risk, High Value solution" proposed by intelligence.

35.     On December 8, intelligence's Baron (copying Shah and Thacker) sent WCB's Bargy, Justice, and Nesbitt a 66-page Implementation Services Proposal, detailing the scope and services intelligence proposed to provide to WCB to implement an SAP system to meet WCB's

business needs, following up with a presentation on December 12 to the WCB Selection Team,
including Bargy, Justice, Nesbitt, and WCB's Senior Vice President and Chief Financial Officer,
Jim Hillenbrand.  itelligence represented that Phase 1 of the proposed project would take 42
weeks and cost between $5.8 million and $6 million, encompassing the creation of the global
template, and go-live for Zebco and WCB Corporate.  Phase 2 would rollout the SAP system to
Char-Broil and Lamplight and would cost only $475,000 and take 24 weeks, with WCB to have
"Self-Sufficiency by the start of Project [or Phase] 2."  The total proposal estimated a cost of no
more than $6.5 million and a total timeline of just over 15 months to complete both phases.
Baron stated in the cover email "any additional costs beyond this range will be minor."
itelligence represented that "itelligence will perform knowledge transfer" such that WCB would
be able to lead Phase 2 of the SAP system rollout.  itelligence also represented that this two-
phase approach, utilizing a global template and relying on extensive knowledge transfer, was
"[p]roven, successful, low risk."

36.     When WCB expressed concerns about itelligence being able to keep to
itelligence's quoted timeline and budget, Baron sent Hillenbrand, Bargy, Justice, and Nesbitt a
follow-up document on December 17 detailing itelligence's program management methodology,
assuring that "[t]here are 'No surprises'" because itelligence would "continuously communicate"
about risks to the Project.  In addition, itelligence would serve on the highest program
governance boards, including the Executive Sponsor board (responsible for "directing the
process to ensure the project's successful delivery") and the Steering Committee (responsible for
overseeing timing, deliverables, and budget).

37.     When WCB expressed concerns about its ability to implement the SAP system for
Char-Broil and Lamplight in Phase 2 of the Project, itelligence doubled down on the

effectiveness of its global template.  In an email sent by Baron to Bargy, Justice, and Nesbitt on

December 19, intelligence represented to WCB that the work performed in Phase 1 would be

"reusable in the CharBroil [sic] and Lamplight businesses" during Phase 2, in which WCB

would "lead this effort with itelligence in a support role."

38.      Based on its extensive and thorough selection process, WCB decided to use the

ERP software platform developed by SAP AG, and licensed by SAP America, Inc.  At the time,

SAP was the world's largest business software company.  One of the key selling points was that

SAP's HANA offering provided real-time views into business and "immediate analytics [in] real

time."

39.      With regard to itelligence's proposal to implement the SAP solution, WCB relied

heavily on itelligence's representations concerning its global solution integration skills and

global resource availability.  itelligence touted that it was an international company, and could

provide local expert consultants at each of WCB's international business locations.  WCB also

relied on itelligence's representations concerning the suitability of the two-phase global template

methodology combined with the knowledge transfer at the completion of Phase 1.

40.      In December 2014, WCB selected itelligence as the implementation vendor for

the Project.  In making this decision, WCB was persuaded by itelligence's repeated and explicit

representations and assurances that its consultants were experienced in global SAP template

solutions and specific country requirements, and that its project management skills and expertise

– including the application of SAP Best Practices and its and/or SAP's proprietary methodology

– would ensure the success of WCB's SAP implementation.  WCB relied on these

representations in hiring itelligence to be the integrator for the Project, believing itelligence's

representations that itelligence was the right partner, with the right team, providing the right ERP

solution.  Unbeknownst to WCB at the time, these and other express written and oral pre-contract representations made by itelligence concerning the skills it claimed to have, and would assign to the Project, were false.

41.    On February 24, 2015, the parties entered into a Master Services Agreement (the "MSA") governing the general terms under which itelligence was to provide services on the Project ("Services"), which was later amended ("Amendment").  The parties also executed multiple Statements of Work ("SOWs"), change orders ("Change Orders") and amendments setting forth the Services to be provided by itelligence in connection with the global SAP implementation ("Project SOWs" and together with the MSA and Change Orders, the "SAP Implementation Agreement").  WCB also signed a separate Software Licensing Agreement for the use of the licensed SAP software and an agreement for itelligence to provide managed hosting of the SAP system ("Managed Hosting Agreement").

42.    In the MSA, itelligence expressly warranted that it would "provide the Services and perform its responsibilities in a good and workmanlike manner using the highest industry commercial practices and standards."  The official Project kick-off was held in March 2015, and work began on Phase 1 of the Project – *i.e.*, the development of a global template and the implementation of an SAP system operating Zebco and WCB Corporate.

43.    As described more fully below, in its work on the Project, itelligence materially breached the parties' contract and its express warranty by, among other things:

- failing to implement and deliver a global SAP system that met WCB's needs in connection with its business processes and functional requirements;

- failing to adhere to the implementation schedule or budget;

- failing to exercise due professional care in the performance of its Services;

- failing to adequately plan and supervise the performance of its professional Services;

- failing to disclose and/or competently manage risks encountered in connection with its Services on the Project;

- failing to perform sufficient and required software testing;

- failing to provide training and/or knowledge transfer of the SAP software and system to WCB;

- failing to "repair" or "replace the Work Product at no charge to [WCB];"

- failing to refund the fees paid for Work Product that itelligence "is unable to repair or correct . . . within a reasonable time period;"

- failing to provide a "good faith estimate of itelligence time and materials for the anticipated itelligence Service in connection with the [Project];"

- failing to "[l]everage SAP Industry Best Practices;"

- failing to adhere to SAP and/or itelligence implementation methodology;"

- failing to provide Project team members who are "skilled" SAP consultants;

- failing to perform Quality Assurance Reviews to identify, manage, mitigate, and reduce Project implementation risks;

- failing to "[l]everage overall SAP business process integration knowledge to position [a] holistic solution to [WCB];"

- failing to properly "identify scope and estimate functional and/or process gaps between itelligence industry solution and [WCB's] future state business requirements;"

- failing to provide BI reporting to meet WCB's business requirements;

- failing to engage a competent Solution Architect;

- failing to "[a]nticipate[] Project deviations and proactively develop[] corrective action;"

- failing to "[p]ersonalize through SAP system configuration, master data and/or custom technical objects . . . the itelligence solution to [WCB's] business and/or technical requirements;"

- failing to develop and provide an adequate business blueprint, appropriate business process design and finalize solution requirements during the design phase of the Project;

- failing to use "reasonable diligence and good faith efforts to accomplish" certain objectives, including providing WCB "with a technical environment and experienced resources for administering and monitoring their SAP software solution," and "provid[ing] cost-effective support for [WCB's] ongoing technical operations;" and

- failing to "employ industry best practices on the technical installation/configuration of the environment and . . . advise [WCB] of consequences relates to technical configuration options."

## C.  The Problems, Deficiencies, Errors, and Flaws in itelligence's Performance

44.     In or around March 2015, itelligence dispatched scores of consultants and other personnel to commence work at WCB.  itelligence's work on the Project not only breached the parties' contract, but ultimately revealed that its representations to induce WCB to enter into the MSA, the Software Licensing Agreement, Managed Hosting Agreement and each of the Project SOWs were false.  itelligence's work on the Project demonstrated that, contrary to its representations, (i) itelligence's global template design was unsuitable to WCB's needs, (ii) itelligence lacked the necessary skills, experience, and expertise in SAP software and project management, and (iii) itelligence was unable to properly design and integrate an SAP system capable of processing the Company's basic business functions.  Additionally, itelligence's phased implementation proposal – with itelligence creating the global template, managing the implementation for Phase 1 and then simply assisting WCB with the rollout of Phase 2 – was revealed to be a scam, with itelligence never creating a functional global template or engaging in the requisite knowledge transfer.

45.     itelligence's work on the Project also revealed that itelligence's timeline and estimated fees were vastly understated and were not feasible, and were intended to mislead WCB.  The Project quickly ballooned from two phases to a whopping *eight-phase rollout*, extending over several years at more than *three times* the budget itelligence quoted.

Additionally, itelligence's proposal did not disclose its resource limitations, including the lack of relevant expertise and availability of competent consultants, prior to contracting with WCB.

46.     Thereafter, as set forth below, itelligence's mismanagement and deficient execution of the Project resulted in poor quality work product, missed deadlines, and significantly increased implementation costs, inflicting severe damage on WCB.

> (i)     *itelligence's Global Template Rollout*
> *Was Unsuitable to WCB's Needs*

47.     WCB is comprised of separate businesses, including Char-Broil, Zebco, Lamplight, and WCB Real Estate.  These businesses use different financial systems with very little integration among the systems.  Each organization has different core competencies and performs its business operations in a unique way.  This makes implementation of a single, central ERP system a challenging process.  itelligence knew that WCB needed a customized solution to address its complex business requirements, yet knowingly misrepresented to the Company that WCB could save time and money by utilizing itelligence's pre-configured global template solution with phased rollouts to the different business divisions.  itelligence's proposal was unsuitable for WCB's stated business needs, and resulted in larger expenses and an extended timeline.  Using this ill-suited template placed the subsequent implementation, and consequently the entire Project, at substantial risk.

48.     Itelligence assured WCB delivery of an SAP system within a reduced time and for an attractive price by utilizing itelligence's pre-configured solution in order to induce WCB to enter into a consulting engagement with itelligence.  Once retained, itelligence would be able to upsell additional customization to the pre-configured template to correct gaps in the functionality of the template solution.  WCB, however, is a complex organization with multiple companies operating in multiple countries, and was never an appropriate candidate for itelligence's pre-

configured global template plan.  itelligence's timeframes and costs were never realistic given

the complexity of WCB's organization, and WCB's business was never a fit for itelligence's pre-

configured template solution.

49.     itelligence assured WCB that a template would not only be appropriate for the

company's business model, but also could be rolled out more easily to the various business

divisions in a phased implementation, reducing the cost and complexity of subsequent rollouts.

itelligence represented that the global template would be thorough, and itelligence would engage

in the requisite and comprehensive knowledge transfer, such that WCB would be able to handle

subsequent implementations at greatly reduced expense.  However, WCB's business units do not

have a high degree of commonality of procedures, selling different products, operating different

financial systems, and utilizing different methods to ship, deliver, and produce products in

different countries.  itelligence knew that the template solution required significant and complex

configuration and customization to meet WCB's business requirements, but did not disclose this

fact to WCB.

50.     Although itelligence represented that the initial template would cover 80-85% of

WCB's business design with small changes or "localization" required for subsequent rollouts,

the initial template did not encompass the majority of the necessary requirements, and each

rollout required significant changes, resulting in significant time, effort, and expense to

implement each new rollout.  WCB did not have the ability to implement such complex rollouts,

and had to hire outside vendors at great expense to design and implement the subsequent phases

of the Project, which is still not complete.

51.     Additionally, itelligence failed to use multiple landscapes, as is directed by SAP

Best Practices for a phased, global implementation such as the Project.  A landscape is the

arrangement of servers that permit developers to separate work on development (where consultants configure the SAP system to meet the specific business requirements), quality control (where the configuration is tested), and production (where the live data of the company is recorded). itelligence's use of a single landscape has required WCB to develop and test new phases of the SAP system alongside live data being recorded in the previous phases already implemented. itelligence's use of a single landscape for both the phased rollouts and for production support has caused numerous issues, including restricting the ability to perform end-to-end testing, compromised ability to effectively isolate and remedy production support issues, and restricted ability to apply SAP support packages and corrections without impacting production support. itelligence's use of a single landscape also has added risk to WCB's future projects and support of the SAP system, because subsequent fixes and testing can impact the production support of WCB divisions that are already live on SAP.

52.     The poor fit of itelligence's pre-configured SAP solution combined with the complexities and differences among WCB's businesses nullified the effectiveness of itelligence's global template approach, and has resulted in increased implementation timeframes and greatly increased cost to WCB. itelligence's proposal of services to WCB did not include viable or realistic timeframes and cost estimates because they did not account for the high level of configuration and customization that itelligence knew would be required to meet WCB's business requirements. The Project could never have been done in the timeframe and for the cost quoted and contracted for by itelligence, a fact that itelligence knew prior to contracting with WCB.

> **(ii)     itelligence Failed to Provide Appropriate Blueprinting**
> **and Design, Further Concealing Its Fraud and the**
> **Unsuitability of Its Global Template**

53.      The first step in a global SAP template solution is to define the global business

processes by gathering requirements from all entities during a series of workshops.  During this

"blueprinting phase," the consultants identify the client's existing business processes and

requirements (the "as is" processes) and then formulate a design for the future business processes

in the context of the chose ERP software solution (the "to be" processes).  The resulting

"blueprint" is a map of an organization's standardized business processes setting forth the

functional requirements to be configured and programmed into the new SAP system, as well as

interfaces to other legacy software systems that will need to pass data to, and receive data from,

the ERP system.  The blueprinting phase also generates the functional specification documents

upon which the technical software consultants rely to write programs and configure an ERP

system in conformity therewith during the "realization phase."  It is critical to the success of any

SAP implementation project that the requirements gathering phase be conducted thoroughly and

accurately because it sets the guiding principles for the design and overall solution from the

outset of the project.

54.      The blueprint is particularly crucial for a phased implementation utilizing a

template design, as subsequent rollouts depend upon the integrity of the original blueprint.  As

proposed by itelligence, the global template was expected to deliver an "85%+ fit" addressing

most of WCB's business requirements, with the remaining 15% to be met by entity-specific

customization and/or country-specific localization.

55.      Incomplete and improper identification, definition, and mapping of business

processes and interfaces during the blueprinting phase, if not corrected early in the

implementation schedule, results in an ERP system that is improperly configured and coded, and that will therefore be unable to perform necessary business functions.

56.     itelligence led the blueprinting phase of the Project, which began in March 2015 and continued through May 2015, with meetings held in both WCB's headquarters and in the Char-Broil offices in Columbus, Georgia.  Pursuant to the parties' contract, itelligence was required to staff the Project with team members "who are skilled and trained as SAP consultants."  Further, itelligence was responsible for conducting the functional and technical workshops, with demonstrations of SAP Best Practices scenarios, to develop WCB's future business process flows and finalize the solution requirements in a global template.  None of the WCB employees who were involved in the blueprinting phase of the Project had prior global SAP implementation experience at WCB, and were relying on itelligence to advise and guide them to ensure that the global template would address WCB's business requirements.  However, itelligence failed to conduct appropriately robust blueprinting workshops.

57.     itelligence also failed to provide guidance about how WCB's business processes would operate in SAP to the WCB employees who participated in the blueprinting workshops. None of the WCB employees who were involved in the blueprinting phase of the Project had prior experience with implementing a global SAP system, and yet were tasked by itelligence with approving key design decisions without any understanding about how such designs would impact functionality in the new system.  itelligence failed to provide any advice on how to utilize SAP standard functionality, instead opting to create RICEF development objects (Reports, Interfaces, Conversions, Enhancements/Customizations, Forms) – which are less efficient, less effective, and much more expensive and time-consuming to create – to address WCB's identified

business requirements.  Many of these RICEF development objects were eventually replaced
with standard SAP functionality, resulting in wasted time, effort, and expense.

58.      Not only did itelligence fail to identify key business requirements, but the final
blueprint prepared was grossly deficient.  Among other failures, itelligence's blueprint was
missing a substantial number of SAP "building blocks" (i.e., preconfigured scenarios that
provide baseline functionality) which were meant to be able to be "leveraged to expand to future
stages," and failed to adequately document the requirements for WCB's financial module,
quality management processes (a critical function in warehouse operations that permits
inspection of goods), EDI (the gateway through which WCB transacts business with its biggest
customers), planning and forecasting processes, taxes, shipping, role-mapping, and vendor
portals.  itelligence's blueprint was missing business process flows, which are critical in
explaining the SAP process to WCB's staff and management that would be using the system, and
help to define the business roles impacted by the implementation of the new SAP process.
itelligence failed to appropriately inventory RICEF development objects in the blueprint, which
address the gaps that the system will have in developing the SAP solution and can account for
50-70% of a project's budget during the realization phase; this caused delays and cost overruns.

59.      While a blueprint should be a concise, professionally-edited document that can be
easily distributed across WCB to staff, managers, senior executives, and decision-makers,
itelligence's blueprint appeared to be the result of "cutting and pasting" meeting minutes,
including copying unanswered questions.  It is apparent from reviewing the blueprint that
itelligence rushed preparation of the blueprint in order to meet its deadline, which was already
several months delayed.

60.     Additionally, itelligence failed to prepare completed functional specifications, with large sections of the function specification templates left blank, particularly regarding testing.  Failure to have complete functional specifications meant that itelligence was permitting development without having appropriate approvals, which put the Project at substantial risk that the actual requirements were overlooked, incorrectly coded, and/or not properly developed.

61.     As a consequence of the incomplete blueprint, and because itelligence designed the global template without sufficient understanding of the complexities involved in the operation of WCB's business, there were design changes late in the implementation timeline, at significant cost to the Project budget and timeline.  Correcting the blueprint necessarily bleeds into the timeframe reserved for other implementation tasks, putting subsequent build and configuration at risk of failure and extending the overall timeline.  Post-implementation costs are significantly increased as incorrect or incomplete requirements are discovered, and have to be remedied.

62.     The substantial deficiencies in itelligence's blueprint concealed the true cost of the Project, and prevented WCB from being able to accurately evaluate if the Project should proceed as intended, should be re-scoped, or should proceed with a different implementer.  By failing to deliver a comprehensive, accurate, and completed blueprint at the start of the Project, and by concealing the effort and work that was actually required, itelligence misled WCB about the scope of the Project, the realistic timeframe and cost, and the feasibility of WCB leading Phase 2 of the implementation.

63.     The grossly deficient blueprint also failed to provide a path to guide WCB for later rollouts to its other businesses, dramatically increased the timeline for completion of the

Project, and compelled WCB to hire additional consulting vendors at an expense far beyond that estimated by itelligence.

### (iii)   *itelligence Failed to Properly Build and Configure the System*

64.   itelligence was responsible for building and configuring the SAP system during the realization phase of Phase 1 so that the SAP solution would support WCB's business needs.

65.   Rather than build a system that accommodated WCB's required business processes and avoided unnecessary changes, itelligence built an overly complex and inefficient SAP solution that was not configured pursuant to industry standards of care for an SAP implementation of the Project's size and complexity, and that did not efficiently address WCB's actual and necessary business processes.  Additionally, itelligence's development techniques suffered from recurring instances of unnecessary and inefficient programming and data handling.

66.   The custom developments programmed by itelligence in WCB's SAP system reveal that itelligence did not follow standard programming guidelines, compromising the efficiency, performance, and maintainability of the SAP code in the production system. itelligence's programming is marred by inconsistencies in naming conventions, program documentation, and file formats.  Programmers need to know why the program was written, what the program is supposed to do, and how the custom program works with SAP standard code. Basic common standards, such as stating the purpose of the program, are missing from the program contents, and in-line documentation is extremely poor, making future maintenance and support much more time consuming, difficult, and costly.  itelligence engaged in poor programming practices, such as "hard-coding" and memory references.  As a direct result of customizing directly into the SAP code, WCB will be severely handicapped in later upgrading the system, and can expect upgrades to be much more time-intensive and costly.  itelligence programmers also did not perform code review, which checks the quality of the programming

performed.  SAP has standard tools which help developers identify and resolve bad programming practices; itelligence failed to utilize these tools, and bad programming practices are rampant in itelligence's work product.  Such programming inefficiencies demonstrate itelligence's lack of knowledge and expertise with current SAP software offerings and SAP best practices.

67.     itelligence developers also failed to use an optimized data extraction technique to replicate data from one system to the next, causing unnecessary increases to the time to load data and requiring the creation of temporary data.  itelligence developers also used inefficient techniques in data modeling, resulting in gaps that will not meet the requirements of WCB's business divisions and could result in inaccurate information reports.

68.     As a result of itelligence's failure to build and configure the SAP system appropriately, the SAP system in production at WCB does not perform all of the business processes WCB requires, is at risk of producing inaccurate information reports, and is more costly, time-consuming, and difficult to maintain going forward.

### (iv)     *itelligence Failed to Staff the Project with Qualified and Experienced Consultants*

69.     itelligence's pre-contract representations to WCB concerning itelligence's alleged ability and intention to furnish WCB with appropriately experienced and skilled SAP consultants were materially false and misleading.  At the time those representations were made, itelligence knew that it had nowhere near a sufficient number of consultants with the requisite skills and experience to work on the Project, and itelligence knew that it had no intention (because, among other things, it had neither the capability nor the financial incentive) to source and assign such consultants to the Project.

70.     Contrary to itelligence's representations touting its purported expertise, the itelligence consultants assigned to the Project did not have the appropriate SAP experience, or

experience managing an ERP implementation of the size and complexity of the Project. In their stead, itelligence assigned neophyte consultants, many of whom lacked even a basic understanding of SAP. The handful of itelligence consultants who did have such SAP experience were rolled off the Project by itelligence shortly after they started.

71.     Some critical roles remained vacant because itelligence could not fill them with appropriately skilled consultants. For example, itelligence failed to provide a consultant in the role of Solution Architect. The Solution Architect plays a critical role in interpreting a client's business requirements into a solution that can be configured. The Solution Architect operates as a single point of contact for a client, and is responsible for the design, build, and implementation of a complex ERP solution from an application and business process standpoint. By failing to fill the role of Solution Architect, there was no one to review the work of the Project team to ensure the effective integration of different work streams during the Project design or testing phases. itelligence's failure to fill this critical role contributed to its deficiencies in the blueprint.

72.     Additionally, itelligence was incapable of providing WCB with consultants skilled in SAP's warehouse management module, "eWM." The consultants provided by itelligence for eWM were uniformly incompetent, and either quit or were removed shortly after joining the Project. Some itelligence consultants were very junior with absolutely no warehouse experience. Despite itelligence's pre-contract representations concerning the skills of its eWM consultants, itelligence admitted in May 2016 that "[a]t the time of contracting and commencing the eWM services, ***itelligence had no knowledge of SAP's new eWM release***." itelligence's failure to provide any qualified personnel for eWM was so disastrous that WCB had to identify and hire a different vendor to handle this piece of the Project to fill the gap in itelligence's competence, at enormous expense to the timeline and budget.

73.     itelligence was also incapable of providing WCB with consultants skilled in electronic data interchange ("EDI"), the gateway through which WCB transacts business with its biggest customers.  The consultants provided by itelligence for EDI were completely incompetent, and itelligence admitted that itelligence's "EDI resources lacked the requisite knowledge to perform the assigned task."  Additionally, itelligence's ill-suited proprietary EDI product – that itelligence had expressly represented would save WCB thousands of hours and significant amounts of money – proved to be applicable to less than 10% of the needed work, requiring WCB to have to retain and pay for more EDI services.  itelligence's inability to provide any qualified EDI personnel was so profound that once again WCB had to hire a different vendor to handle this piece of the Project to fill the gap in itelligence's competence, once again at enormous expense to the timeline and budget.

74.     Through this "bait-and-switch" sales technique, itelligence induced WCB into hiring itelligence in the belief that, based on itelligence's specific representations, itelligence had the ability and intention to assign competent SAP-experienced personnel to the Project.  In fact, itelligence had neither the ability nor the intention to assign such personnel to the Project.

75.     Moreover, throughout the design and implementation, itelligence constantly shuffled its personnel onto and off of the Project.  The revolving door of itelligence consultants severely disrupted the Project in that, among other things, it:  (i) deprived WCB of the few itelligence personnel who had acquired relevant SAP skills; (ii) deprived WCB of the few itelligence personnel who had gained some familiarity with and understanding of WCB's business processes; and (iii) resulted in incomplete and ineffective training of replacement consultants, delays in critical Project tasks, and inferior work product, as various tasks were not

performed and monitored by the same person from beginning to end, or even for substantial periods of time, and inconsistent methods and approaches were applied.

76.     At times, itelligence's staffing practices appeared to be aimed at providing its consultants with experience that would be useful for other clients, or to land new clients, rather than for WCB's benefit.

77.     Notwithstanding that itelligence, as the project integrator and manager, was uniquely in a position to know the staffing arrangements and level of SAP and project management experience and expertise necessary to perform itelligence's responsibilities, itelligence supplied personnel whose SAP expertise was insufficient to perform a proper installation in the first place, and then aggravated that problem through the reassignment practices described above.

78.     The itelligence consultants' lack of requisite skills and experience resulted in an incorrectly designed system that did not leverage the core software and best practices for implementing SAP.

### (v)     itelligence Failed to Provide Adequate and Appropriate Project Management

79.     itelligence was responsible for providing project management to the Project, including providing advice on the overall direction and strategy for the Project, enhancing the efficient management and delivery of the Project, managing costs, reducing implementation risks, implementing appropriate governance, business, and IT controls, supporting on-boarding and off-boarding of resources, providing information to business leaders, and identifying, assessing, and documenting specific failures and issues that could impact the overall Project performance.

80.     Further, itelligence was obligated to provide a Project Manager who would work with WCB to manage the Project by, *inter alia*, (i) "leveraging experience and in-depth knowledge of SAP implementation methodology;" (ii) "anticipat[ing] Project deviations and proactively develop[ing] corrective action;" (iii) "[c]hampion[ing] adherence to SAP Best Practice to project team and steering committee;" and (iv) "leverag[ing] overall SAP business process integration knowledge to position [a] holistic solution to [WCB]."  The itelligence Project Manager was also responsible for providing WCB's executive management Project team with "clear and concise direction regarding project charter, scope, plan, budget, strategy, standards and deliverables."

81.     itelligence failed to meet these obligations.  Among other things, itelligence was not organized or transparent, failed to define, structure, and communicate the roles of WCB employees and other third-party vendors, failed to generate appropriate Project documentation, and failed to identify and resolve the many issues that plagued the Project.  These unresolved issues included the deceptive estimates of the timing and cost of the Project, the failure to notify WCB during blueprinting about the lack of fit of itelligence's global template system to WCB (i.e., that the complexities of WCB's business would mean that the rollouts would not be accomplished in the timeframes and costs quoted by itelligence), the poor quality of the blueprint, the total failure in testing, the failure to follow SAP best practices in the design of the system, the staffing of the Project with incompetent resources, the lack of programming code reviews, and the failure to provide adequate system documentation.

82.     itelligence's project management was compromised by the fact that itelligence could not provide a capable, competent project manager to manage the Project.  In fact,

itelligence cycled through *four project managers* in just over two years.  Such turnover in the critical project manager role is unheard of in ERP software implementations.

83.     Additionally, itelligence's project management did not have a methodology or structure in place for formal escalation of risks or issues, or reviews of the Project to ensure that the timeline and budget were not exceeded.  When itelligence's failures caused delays that left its consultants temporarily without work on the Project pending completion of other tasks that was behind schedule, itelligence threatened to transfer these critical employees off the Project unless WCB continued to pay for their down time to secure the resource.  Thus, itelligence profited as a result of its own delays.

84.     One particularly egregious project management failure was itelligence not addressing WCB's reporting requirements prior to Phase 1 go-live.  The reporting requirements were provided to itelligence and itelligence was aware of the importance of reporting to WCB's operations.  Reporting is a critical function of every SAP implementation project and the reporting requirements must be addressed during the blueprinting, with the reports required to run WCB's operations built and tested prior to the system go-live.  itelligence failed to follow basic SAP implementation methodology and missed a critical component required by WCB to operate its business.  itelligence's approach to reporting was grossly negligent and shows a fundamental lack of project management and SAP expertise.

85.     In another project management lapse, itelligence permitted the individual Project teams to work in silos.  As a result, the individual Project teams did not know (i) whether their designs were compatible with the other teams' designs (i.e., whether the teams were designing in conflict); (ii) whether critical tasks had been performed; (iii) which team was responsible for performing which tasks; or (iv) whether the teams should be moving onto the next phase of the

implementation.  This lack of cross-process communication affected every aspect of the Project, including design, build, and testing.

> **(vi)     itelligence Deliberately Under-Tested the System and Failed to Ensure that the System Was Adequately Tested**

86.     The testing phase is critical to any ERP implementation, as it presents the opportunity to identify and remedy any inherent design, configuration, programming, or interface defect, among others, *before* the system goes live – that is, before such inherent technical defects can cause substantial damage to an organization or its customers.

87.     itelligence's testing of the SAP system before it went live was fundamentally flawed and woefully inadequate.  Among many deficiencies, itelligence failed to follow standard testing protocol, including the design and development of testing scripts that would detect bugs in the system and other design flaws.  itelligence also failed to test the kind of data transactions needed to accurately replicate the reality of WCB's business operations.  itelligence's failure to adequately test the multi-currency functions of the consolidated financial reporting features of the SAP system before go-live required WCB to incur further costs to attempt to address issues after the system was in production.  Additionally, itelligence had WCB employees create the test scripts and without any guidance, knowing that WCB had no prior SAP experience creating test scripts.

88.     itelligence also failed to perform essential "end-to-end" integration testing, critical to ensure that the end-to-end business process is working.  Without such integration testing, the inter-operability of the SAP system with non-SAP systems could not be properly validated. Instead, itelligence merely repeated unit testing and string testing.  The first integration testing cycle was very small in scope, and was performed by consultants rather that WCB's end-users. This failure to complete a proper first integration testing cycle meant that later testing cycles

were more difficult to complete.  Additionally, itelligence did not reserve enough time to complete integration testing, creating an unreasonably compressed timeline for end-to-end testing.

89.     itelligence also failed to utilize standard SAP testing tools to manage repeatable testing scenarios, creating inefficiencies and adding unnecessary complexity to testing.  The system used by itelligence was not specifically designed to track and manage integration testing, and is not easy to utilize.  Such an inefficient tool increased the amount of time required to complete testing, adding further pressure to the already compressed timeline for testing.

90.     While itelligence's flawed and incomplete testing stemmed in part from its lack of SAP expertise and general incompetence, itelligence's inadequate testing also reflected a deliberate effort to conceal its own deficient work product, continue to collect fees, and proceed with the scheduled Phase 1 go-live at all costs.  Thus, itelligence repeatedly ignored or rebuffed input from WCB employees who questioned whether itelligence was running test scripts that were too simplistic, as opposed to conducting tests that simulated the Company's actual complex business scenarios.

91.     In addition to failing to test the kind and quality of data transactions needed to accurately replicate the reality of WCB's business, itelligence also failed to test "negative scenarios" that could have revealed where problems might lurk, both within the SAP system and within the interfaces between the SAP system and the other legacy systems.  As it happened, many of the "negative scenarios" that itelligence did not test were precisely the scenarios that, when they occurred in the live production environment following the go-live, proved the most problematic, and inflicted the greatest damages on the Company.  By deliberately "under-

testing" in this manner, itelligence ensured positive – albeit wholly artificial – test results that provided a false validation of the SAP system's ability to maintain data integrity.

92.      itelligence also failed to ensure proper regression testing, which seeks to validate that the work performed to fix defects identified during testing was successful, thereby confirming that those defects were in fact remedied and that the system going live will be stable and function properly in a production environment.  Because defects are fixed through the release of new or revised software code and configuration, it is imperative that the updated code and configuration be regression tested, not only to verify that the new code and configuration have remedied the defect, but also to verify that the new code and configuration have not adversely affected other applications within the SAP system.

93.      itelligence was responsible for sufficiently testing the system prior to the scheduled conversion, and was therefore in a position to know whether the system had been tested adequately and performed properly during such testing.  itelligence's representations to WCB concerning the suitability of the testing procedures and the artificially positive testing results were made with the knowledge of, or reckless indifference to, the fact that such representations were false.  WCB relied upon such misrepresentations, and related omissions concerning testing, in its decision to approve each go-live date.

(vii)    *itelligence Failed to Provide Knowledge Transfer to WCB*

94.      itelligence represented that, at the conclusion of Phase 1 of the Project, WCB would be appropriately trained and knowledgeable to handle the implementation of Phase 2 with minimal assistance from itelligence.  itelligence would perform a thorough and comprehensive "knowledge transfer" to make WCB self-sufficient and able to use itelligence's global template developed during Phase 1 to perform the 15-20% customization for the Company's remaining

business units.  itelligence's knowledge transfer was fundamentally flawed and woefully
inadequate.

95.     As itelligence knew during the pre-contract discovery sessions, WCB did not have
any prior SAP global implementation experience.  No amount of "knowledge transfer" would
ever be sufficient to bring WCB to the level of capability necessary for the implementation of an
SAP system that could meet WCB's complex and varied business needs and requirements.
Additionally, because itelligence was perpetually behind schedule and at risk of missing
deadlines, itelligence refused to engage in the knowledge transfer, repeatedly telling WCB that
there was no time.  As a result, there was insufficient and wholly inadequate knowledge transfer
at the conclusion of each go-live.

96.     itelligence also deviated from standard SAP implementation methodology and
practice by intentionally and/or recklessly failing to sufficiently document its design and
configuration of the SAP system build.  Nor were adequate records maintained to reflect the
continuous changes and updates to the functional design that occurred during the
implementation.  itelligence failed to prepare consistent configuration documentation, which is a
critical step in providing knowledge transfer from the consulting team to a client's internal
support organization.  Such documentation, had it been prepared, would have provided WCB
with information and reasoning as to why configuration steps were performed.  itelligence's
failure to appropriately document its work on the Project exacerbated WCB's difficulties in
identifying and attempting to remedy the defects in the SAP system that itelligence had designed
and configured.  This failure also made knowledge transfer impossible, because WCB could not
refer to coherent and complete configuration documentation.

**D.    The System Defects and Flaws Resulting from itelligence's Lack of
Skills and Its Substandard Design, Testing, and Implementation Services**

97.    The two-phased SAP implementation timeline touted by itelligence, with Zebco

and WCB Corporate going live in December 2015 and the remaining business units going live by

August 2016, was quickly abandoned.  By October 2015, the two phases transformed into six,

and then eight, separate go-lives, differentiating business units and then regions.

98.    The first scheduled go-live became Zebco's non-U.K. European operations

("Zebco EU"), with a go-live date scheduled for December 2015.  This go-live date was

extended and then eventually broken again into two pieces, with Zebco EU financials taking

place in January 2016, and the remainder of the Zebco EU business happening in March 2016.

Immediately following the two go-lives, and continuing for months thereafter, the new SAP

system experienced significant issues.  Printers were never set up nor tested, and labels, forms,

and other critical business forms were never configured or tested to account for country-specific

requirements (including special characters).  Delivery notes and invoices were incorrectly

translated, and invoices failed to reflect the correct (or any) discounts, and in some instances

were just completely incorrect, necessitating credits; many invoices also violated E.U. tax

requirements, opening Zebco EU up to liability.  EDI was a complete failure, and did not work

for months, and WCB's inventory had to be performed manually.  Some interfaces between the

new SAP system and WCB's legacy systems did not work for nearly a year after go-live.  Costs

were inconsistent between WCB's accounting and bills of material.  Because so many of these

issues were customer facing, itelligence's failures destroyed customer confidence in Zebco EU

and damaged long-standing relationships with key customers.  Zebco EU lost 20% of its

customer sales as a direct result of itelligence's fatal SAP implementation, and transformed from

a profitable business unit to operating at a loss every year since itelligence's defective system

went live.  Zebco lost new business with new customers and lost incremental business with existing customers because of itelligence's failed SAP system.  itelligence, meanwhile, continued to bill WCB for its time far beyond the agreed-upon budget, to fix its own mistakes.

99.     In response to the Zebco EU go-live failure, on May 9, 2016 WCB issued to itelligence a Notice of Material Breach.  WCB demanded that itelligence fix the problems and provide a detailed remediation Project plan.  On May 19, Tim Breen, itelligence's chief financial officer, admitted in an email that "it is not possible to deliver the project within the original estimated cost."  Attached to Breen's email was a letter in which itelligence admits that it misrepresented its competence to deliver the SAP system, including that:  (i) "itelligence acknowledges that certain EDI resources lacked the requisite knowledge to perform the assigned task;" (ii) "[a]t the time of contracting and commencing the eWM services, itelligence had no knowledge of SAP's new eWM release and its affected [sic] on eWM;" and (iii) "itelligence inadvertently omitted the work effort required to prepare the SAP security functionality" for two separate modules.  itelligence also acknowledged "that there were a number of post implementation issues" with Zebco EU, and requested the opportunity to rectify its prior failures.

100.     Also attached to Breen's May 19 email was itelligence's proposed remediation plan (the "Remediation Plan").  In the Remediation Plan, itelligence admitted that it had engaged in "Resource churn," that it lacked "resource quality," and that itelligence had underestimated the complexity of WCB's businesses.  Pursuant to this Remediation Plan, itelligence nearly doubled the budget to complete Phase 1 of the Project (including the implementation of Zebco's North American operations), finally committed to assigning Solution Architects, and agreed to engage additional vendors who actually possessed the expertise that itelligence falsely represented it possessed to WCB during the pre-contract period.  itelligence continued to

represent that itelligence's "knowledge transfer" would permit WCB to lead subsequent rollouts of the SAP system to Char-Broil and Lamplight.

101.    Thereafter, Hillenbrand and Bargy travelled to Cincinnati on May 26, 2016, to meet with Breen, Shah, itelligence's President and Chief Executive Officer, Steve Niesman, and itelligence's Chief Operating Officer for Germany, Uwe Bohnhorst.  At this meeting, WCB discussed the numerous critical failures from the Zebco EU go-live, the failures of the itelligence personnel, reimbursement for itelligence's fees, and WCB's willingness to move forward with itelligence.  Following this meeting, relying on itelligence's representations that it was able to deliver the Project, WCB and itelligence renegotiated the Phase 1 contract and executed the Amendment, changing the fee and payment arrangement from time and materials to a fixed fee with a payment schedule tied to achievement of milestones, discounts on itelligence's fees, and transferring part of the scope of work away from itelligence and onto third-party vendors.

102.    Following a small go-live of WCB Corporate and WCB Real Estate business unit operations, Zebco's North American operations ("Zebco NA") was next in line for go-live. Although originally planned to go-live in December 2015, this go-live date was repeatedly moved out and eventually took place almost a year later in November 2016.  Like the Zebco EU go-lives, the new SAP system experienced significant issues that persisted for the coming months.  Forecasting data was incorrect and would often randomly disappear from the system altogether.  As a result, the business was required to resort to the manual creation of forecasts using spreadsheets.  The Zebco NA go-live was also incomplete, and completely lacked any reporting.  Immediately following the go-live, and continuing for months thereafter, the new SAP system experienced significant issues because of the inability to generate any reports.

intelligence, meanwhile, continued to bill WCB for its time far beyond the agreed-upon budget, to fix this glaring gap in its blueprint and design.

103.    Based on intelligence's admitted and repeated failures, WCB undertook a fit-gap analysis to re-scope Phase 2 and further extend the implementation timeline.  intelligence's Brad Fisher, Dave Hutchins, and Thacker assured WCB's Bargy over the course of months, even meeting in person in Columbus, Georgia, that intelligence would make the necessary changes to salvage the Project.

104.    After having signed the MSA, intelligence continued to break apart the original two-phases into increasing sub-parts, with go-live dates moving further and further out. Although intelligence had represented that all of WCB's business units would be up and running on the new SAP system by mid-2016, the go-live dates continued to be extended.  Char-Broil's North American business was moved from mid-2016 to July 2018; Char-Broil's European business moved from mid-2016 to end of 2017; Lamplight was delayed into 2019, nearly three years after intelligence's original timeline.

105.    To date, WCB has paid intelligence more than $20 million.  This amount does not include the millions of dollars WCB has paid to third-party vendors to perform work originally scoped to intelligence, or the costs to complete the implementation for Char-Broil or Lamplight.

106.    In June 2017, WCB demanded that intelligence make a presentation to WCB's senior leadership.  This meeting took place in Columbus, Georgia on July 18, 2017.  Attendees from intelligence included Thacker, Brad Fisher, and Dave Hutchins.  At this meeting, intelligence admitted that the original plan was not workable, that the program ballooned from two to eight separate phases, and that the original time and budget estimates were not feasible given this structure.  intelligence admitted that it lacked necessary and critical skills, particularly with regard

to warehouse management, and that "[h]eavy support" was required from consultants going forward.  itelligence admitted that an "[e]longated timeline" would be necessary.  itelligence represented that it would change project managers – *again*.  In a particularly critical admission, itelligence conceded that its project management was disastrous, and that going forward it would start "communicating project risks to W.C. Bradley along with mitigation plans," "ensure steering committee has the knowledge to make accurate/timely decisions," and establish a "[f]ormal Quality Review at key points in the project."

107.     The extensive costs incurred by WCB, the extended timeframes to support only a portion of WCB's requirements as defined in the Project contracts, and the failure to fully deploy the software across all of WCB's legal entities, business functions, and international locations demonstrate itelligence's failure to properly implement the global SAP solution that it assured WCB it would deliver.

108.     itelligence's conduct has resulted in a project that has failed to meet planned timelines, is considerably over budget, has not been fully implemented, and does not meet WCB's objectives as clearly presented to itelligence during the sales cycle for the Project. itelligence's deficient performance and delays have diverted WCB's internal resources and prevented WCB from pursuing other business opportunities, including new acquisitions and enhancements to legacy systems.

**E.     By Failing to Fulfill Its Role and Failing to Advise WCB of the Severity of Project Risks, itelligence Engaged in Ongoing Misconduct Throughout the Project**

109.     itelligence knew that the Project had certain risks in light of, among other things, WCB's complex functional and business process needs, the fact that this Project was a global implementation, the intricate interfaces required to integrate the SAP system with WCB's various other systems, and the aggressive implementation schedule and budget.  As a result, in its

role as the systems integrator, intelligence was required to take steps to alert WCB to risks and to adequately and appropriately mitigate and manage them.

110.    At various times during its performance on the Project, intelligence knew, or should have known, about critical risks that threatened to jeopardize or undermine the Project and that required the provision of appropriately skilled and experienced consultants. intelligence had a duty to disclose such risks to WCB, yet failed to do so. intelligence (i) knew about the following exemplary risks; (ii) should have, but did not, alert WCB management to such risks; and (iii) should have, but did not, take steps to manage and mitigate such risks. As to the following exemplary risks, intelligence failed to adequately and appropriately disclose to WCB, during the pre-contract stage or at any time during the Project, that:

- the Project could never have been done in the timeframe and for the cost quoted and contracted for by intelligence, and that intelligence's proposal of services to WCB did not include viable or realistic timeframes and cost estimates;

- the global template rollout was unsuitable to WCB's needs;

- the blueprinting was inadequate and that intelligence would not be able to properly design, configure, and test the SAP software to meet WCB's functional requirements and in the required time frame;

- intelligence did not have the ability or intention to provide WCB with consultants with the necessary skills, experience, and expertise in the design, build, configuration, testing, and project management areas, among others, necessary to perform the SAP implementation at the Company; and

- the SAP system it was implementing at the Company had not been thoroughly tested.

111.    Notwithstanding intelligence's duty and obligation to disclose risks on the Project, Thacker and other intelligence Project leads instead declared periodically that there would be no "red flags" on the Project, meaning that no issue would be flagged as so severe as to warrant a delay in the timetable. intelligence leads were members of the Project's Executive Sponsor group

and the Steering Committee, and had not only the opportunity but the obligation and responsibility to raise risks and issues to WCB management.  Instead, itelligence not only remained silent in the face of risks, but in fact affirmatively discounted and concealed the significance of critical risks in its communications with WCB's management.

112.    itelligence concealed these risks in order to extract additional fees from WCB. After inducing WCB to enter into the lucrative contract and profiting from its share of the SAP licensing fees and maintenance costs, itelligence then failed to inform WCB that the lack of fit of its global template solution, the complexities of WCB's operations, and itelligence's lack of qualified and competent personnel would cause the Project to far exceed the time and price it quoted to WCB.  As the Project proceeded, itelligence continued to inundate WCB with Change Orders that resulted from itelligence's failure to properly scope, staff, and manage the Project. itelligence's performance failures are evident throughout the Project and have continued to the present.

113.    Additionally, by failing to complete the blueprint or execute the knowledge transfer, itelligence forced corrective actions to take place post-implementation, when itelligence was budgeted to be in a support role for WCB.  This guaranteed that WCB would need more help than it should have needed, which meant more fees paid to itelligence.

114.    Not only did itelligence fail to disclose the risks inherent in its deficient design and implementation of the ill-suited global template solution, but itelligence actively silenced critics complaining about risks.

115.    Additionally, itelligence failed to implement a code freeze leading up to the Zebco go-lives.  SAP implementations require a code freeze in the weeks prior to go-live to enable training on the new system and cutover from the old system to the new system.  However,

itelligence did not observe this fundamental code freeze requirement, and permitted significant volumes of changes to be executed up until go-live.  As a result of this failure, the SAP system was not stable at the time of the Zebco EU and Zebco NA go-lives.  Despite knowing these risks, itelligence did not raise any red flags that would have alerted WCB to delay the Zebco go-lives.

116.    Thus, despite the fact that it knew, or should have known, that the global template design was not suitable for WCB's needs, could not be completed on time and within budget, and that the SAP system was not ready to be rolled out on the scheduled go-live dates, itelligence concealed that fact from WCB and recommended that WCB go live as scheduled.  Had itelligence advised WCB of the need to delay the go-lives because of the risk that the SAP system would not be able to meet the Company's business requirements, WCB would have delayed the go-lives until such problems were adequately resolved.  itelligence withheld such information from WCB to further its own interests in meeting Project timelines and continuing to collect fees from WCB, at great expense and damage to the Company.

117.    As a result of itelligence's fraud, an implementation that was initially budgeted for no more than $6.5 million, has now cost WCB more than $20 million.  This amount does not include the millions of dollars WCB has had to pay to third-party vendors to fix the defective work performed by itelligence, or the cost to complete the Char-Broil or Lamplight implementations.  This ballooning of the Project cost estimate represents a more than 300% price increase for delivery of the global ERP implementation that is years behind the originally scheduled Company-wide go-live date (with no planned date for the completion of the Project).  WCB would never have retained itelligence and agreed to incur over $20 million for the implementation of a partially rolled-out, defectively developed ERP system.

118.    intelligence's inability to accurately estimate the effort required for the implementation, combined with its inexperience in building and configuring an SAP system that could perform the processes required for WCB's business, is a classic bait-and-switch. Specifically, after being engaged on the Project to provide an SAP solution that would meet WCB's business needs within a certain timeframe and budget, intelligence failed to provide the necessary functionality and created defects in the system that needed to be fixed, forcing WCB to enter into numerous Change Requests.  Thus, intelligence was able to extract more fees from WCB for work it was already obligated to perform, all as a result of its own deficient design and incompetence.

119.    As a result of intelligence's misconduct, WCB sustained damages, including the following:  the monies wasted on intelligence's deficient work; the loss of the benefits WCB would have received had it obtained a software solution consistent with intelligence's pre-contract representations; internal WCB costs in diverting WCB personnel to work on the Project and to perform intelligence's contractual tasks; the costs paid to subcontractors to perform functions that were delayed by intelligence's deficient project management; the costs in correcting deficiencies in intelligence's work; the costs to perform work-arounds necessitated by system deficiencies; the ongoing expenses in maintaining WCB's legacy systems; lost profits; lost business opportunities; and losses stemming from the delay in WCB's achievement of the benefits it was supposed to secure through the Project.

120.    In 2017, WCB began a preliminary investigation led by a third-party software consulting firm to audit the Project and try and determine a cause for the failures.  When its preliminary investigation indicated intelligence had materially breached the parties' contract, WCB immediately delivered a Notice of Material Breach to intelligence on September 29, 2017.

Following this notice, representatives from WCB and itelligence met on October 10, 2017 to engage in a good faith dispute resolution dialogue.

121.    Because that preliminary investigation also suggested itelligence had knowingly and/or recklessly made false representations about, among other things, itelligence's purported skills and expertise to perform the Project, the timeframe and costs for the Project, and the appropriateness of a global template solution for WCB's business processes, WCB also demanded that itelligence cease work on the implementation so that WCB could conclude its preliminary investigation and determine an appropriate course of action with respect to the SAP Implementation Agreement.

122.    Immediately following the conclusion of WCB's preliminary investigation, on October 20, 2017, WCB delivered a written letter to itelligence announcing the rescission of the SAP Implementation Agreement (the "Rescission Notice").  The Rescission Notice followed repeated failures by itelligence to meet multiple scheduled and rescheduled go-live dates, and the realization that the Project – still without a final go-live date, and now estimated to cost several times itelligence's original estimate – could not continue with itelligence as integrator.

123.    Given the circumstances alleged, and the nature of the Project, it would be unreasonable, if not impossible, for WCB to tender back any aspect of the software implementation.  WCB already has invested $20 million in the Project since 2014, and has devoted thousands of personnel hours to the implementation of the new ERP system.  These systems have become crucially entwined with many important aspects of WCB's business operations around the world, making impossible the return of any of the systems or other Project-related products to itelligence.  Even if WCB were able to return the systems and other products – which it cannot – attempting to extricate the systems and other products from WCB's business

processes in order to attempt to return them would cause WCB's business significant hardship and severely jeopardize WCB's ability to carry out its business and financial operations. Moreover, the systems and other products present no value or use to itelligence.  For these reasons, WCB is unable to return the Project-related systems and products, and requiring WCB to attempt to do so would be impractical, unreasonable, and inequitable.  Furthermore, in light of (i) the gaps, deficiencies, and defects in the Project-related systems and other products that itelligence provided to WCB to date, and (ii) the over $20 million in payments that WCB made to itelligence alone in connection with the Project, it is clear that WCB has paid itelligence amounts in excess of the value of the services, systems, and products that itelligence provided. Under these circumstances, no tender or any other offer to restore to itelligence the value of the services and products that itelligence provided is required.

**COUNT ONE**
**FRAUD, FRAUDULENT INDUCEMENT, AND DECEIT**

124.     WCB repeats, realleges, and incorporates the allegations contained in Paragraphs 1 – 123 as if fully set forth herein.

125.     As set forth above, itelligence made numerous misrepresentations of material facts, and failed to disclose material facts, to WCB regarding, among other things, the suitability of the global template rollout, the feasibility of the timeline and estimated fees, the ability of itelligence to deliver knowledge transfer, and the competency, skills, and experience of itelligence's consultants to perform and deliver the Project.

126.     Such representations were false, and itelligence knew, or was reckless in failing to know, that such statements were false at the time they were made.

127.     itelligence also made false, incomplete and misleading assurances and concealed material facts during the discussions and negotiations leading up to the execution of the  SAP

Implementation Agreement, Managed Hosting Agreement and Software Licensing Agreement, and in the agreements themselves, with no intention of acting or delivering upon those assurances.

128.   By making such false and deceitful representations, and by omitting and concealing material facts from WCB, itelligence intended to deceive WCB, and such misrepresentations and omissions by itelligence were made wrongfully in order to induce WCB to enter into the agreements.

129.   WCB reasonably relied on such misrepresentations made by itelligence in retaining itelligence and entering into the agreements with itelligence.

130.   itelligence knew that if it truthfully conveyed to WCB that it lacked the ability to perform and deliver the Project, WCB would not have selected itelligence as the Project integrator.  itelligence intended that WCB rely on its misrepresentations, and WCB did reasonably rely on itelligence's misrepresentations.

131.   Also as set forth above, after inducing WCB to hire itelligence, itelligence continued to make misrepresentations of material facts, and failed to disclose material facts, regarding its ability and intention to deliver the Project, and to do so in accordance with the Project schedule and budget.

132.   WCB reasonably relied upon itelligence's continued material misrepresentations and omissions of fact during the Project which, unbeknownst to WCB, were made by itelligence in order to induce WCB to enter into subsequent Project SOWs, the Amendment and Change Orders to the Managed Hosting Agreement, and to induce WCB to permit itelligence to continue to purport to work and be paid on the Project.  itelligence's representations to WCB were false,

and itelligence knew, or was reckless in failing to know, that such statements were false at the time they were made.

133.    Through both active and passive means, and both before and after WCB hired itelligence, itelligence fraudulently concealed the facts that (i) the global template rollout was not suitable for WCB's business needs, (ii) the timeline and estimated fees were not feasible and were in fact vastly understated, and (iii) itelligence's consultants lacked the requisite skills and experience to perform and deliver the Project.

134.    As a proximate result of itelligence's fraud and deceit, WCB sustained damages as described herein.

135.    itelligence's fraud entitles WCB to rescind the parties' agreements and to recover damages for fraud and deceit, or, in the alternative, to recover damages from itelligence in an amount to be determined by the trier of fact.

136.    In addition, because itelligence's fraudulent actions were committed knowingly, willfully, in conscious indifference to the rights of WCB, and with a specific intent to cause harm to WCB, WCB is entitled to recover punitive damages in an amount to be determined by the trier of fact.

137.    On October 20, 2017, WCB delivered the Rescission Notice to itelligence that announced its intent to rescind the SAP Implementation Agreement.

138.    Given the circumstances alleged, and the nature of the Project, it would be unreasonable, if not impossible, for WCB to tender back any aspect of the implementation. Given WCB's substantial investment in the Project and the consequences of having to start over with the implementation of a new software system, it would be impractical, unreasonable, and

inequitable to require WCB to tender back any aspect of the Project to itelligence, or to require WCB to restore to itelligence the value of the services it has provided to date.

## COUNT TWO
## NEGLIGENT MISREPRESENTATION

139.     WCB repeats, realleges, and incorporates the allegations contained in Paragraphs 1 – 138 as if fully set forth herein.

140.     itelligence owed WCB a duty of care to provide WCB with accurate, truthful, and complete information regarding, among other things, the suitability of the global template rollout, the feasibility of the timeline and estimated fees, and the itelligence's qualifications and abilities to implement the Project.

141.     itelligence breached this duty by making representations to WCB that were materially false, incomplete, or misleading at the time they were made, by failing to exercise reasonable care and competence in obtaining and communicating information to WCB, and by failing to ensure that the information it provided to WCB was complete and accurate.

142.     itelligence was fully aware that WCB had no experience in implementing a global ERP system, and knew that WCB was depending on and relying upon itelligence to furnish the superior knowledge, expertise, and experience necessary for a successful implementation.

143.     itelligence made these misrepresentations to induce WCB to enter into contracts with itelligence, to not terminate those contracts, and to continue to pay money to itelligence.

144.     WCB reasonably relied upon itelligence's misrepresentations concerning the suitability of the software to meet WCB's business needs, the feasibility of the timeline and budget, and the qualifications and readiness of its personnel to perform the implementation in retaining itelligence, entering into contracts with itelligence, and in permitting itelligence to continue to perform on the Project.

145.    As a proximate result of itelligence's negligent misrepresentations, WCB sustained damages as described herein.

146.    In addition, because itelligence's acts of negligent misrepresentation were fraudulent and committed knowingly, willfully, in conscious indifference to WCB, and with a specific intent to cause harm to WCB, WCB is entitled to recover punitive damages in an amount to be determined by the trier of fact.

## COUNT THREE
## BREACH OF CONTRACT

147.    WCB repeats, realleges, and incorporates the allegations contained in Paragraphs 1 – 146 as if fully set forth herein.

148.    WCB brings this claim for breach of contract against itelligence in the alternative to its fraud claims.

149.    The parties entered into enforceable contracts.

150.    WCB has performed, has substantially performed, or was excused from performing due to itelligence's material contract breaches, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the contracts.

151.    itelligence unilaterally and materially breached numerous provisions of its contracts with WCB.

152.    itelligence's material breaches of contract include but are not limited to itelligence's failure to:  (i) implement and deliver a global SAP system that met WCB's needs in connection with its business processes and functional requirements; (ii) adhere to the implementation schedule or budget; (iii) exercise due professional care in the performance of its Services; (iv) adequately plan and supervise the performance of its professional Services; (v) disclose and/or competently manage risks encountered in connection with its Services on the

Project; (vi) perform sufficient and required software testing; (vii) provide training and/or knowledge transfer of the SAP software and system to WCB; ; (viii) "repair" or "replace the Work Product at no charge to [WCB];" (ix) refund the fees paid for Work Product that itellgence "is unable to repair or correct . . . within a reasonable time period;" (x) provide a "good faith estimate of itellgence time and materials for the anticipated itellgence Service in connection with the [Project];" (xi) "[l]everage SAP Industry Best Practices;" (xii) adhere to SAP and/or itellgence implementation methodology;" (xiii) provide the Project with "skilled" SAP consultants; (xiv) perform Quality Assurance Reviews to identify, manage, mitigate, and reduce Project implementation risks; (xv) "[l]everage overall SAP business process integration knowledge to position [a] holistic solution to [WCB];" (xvi) properly "identify scope and estimate functional and/or process gaps between itellgence industry solution and [WCB's] future state business requirements;" (xvii) provide BI reporting to meet WCB's business requirements; (xviii) engage a competent Solution Architect; (xix) "[a]nticipate[] Project deviations and proactively develop[] corrective action;" (xx) "[p]ersonalize through SAP system configuration, master data and/or custom technical objects…the itellgence solution to [WCB's] business and/or technical requirements;" (xxi) develop and provide an adequate business blueprint, appropriate business process design and finalize solution requirements during the design phase of the Project; (xxii) use "reasonable diligence and good faith efforts to accomplish" certain objectives, including providing WCB "with a technical environment and experienced resources for administering and monitoring their SAP software solution," and "provid[ing] cost-effective support for [WCB's] ongoing technical operations;" and (xxiii) "employ industry best practices on the technical installation/configuration of the environment and . . . advise [WCB] of consequences relates to technical configuration options."

153.    As a direct result of itelligence's material breaches of contract, WCB sustained contract damages in an amount to be determined by the trier of fact.

**COUNT FOUR**
**BREACH OF EXPRESS AND IMPLIED WARRANTY**

154.    WCB repeats, realleges, and incorporates the allegations contained in Paragraphs 1 – 153 as if fully set forth herein.

155.    WCB brings this claim for breach of express and implied warranty against itelligence in the alternative to its fraud claims.

156.    itelligence agreed pursuant to an express warranty in the MSA that it would "provide the Services and perform its responsibilities in a good and workmanlike manner using the highest industry commercial practices and standards[.]"

157.    itelligence also agreed pursuant to an express warranty in the MSA that if its work product failed to perform adequately it would repair or replace the work product at no charge to WCB, and if itelligence was unable to do that, itelligence expressly warranted that it would refund the fees it received from WCB.

158.    itelligence further warranted to provide the Project with team members "who are skilled and trained as SAP consultants."

159.    itelligence also made various express and implied warranties in the Agreement as to the quality, performance, cost, design, integration, and consulting services it contracted to provide to WCB.

160.    itelligence materially breached its express and implied warranties to WCB.

161.    As a direct consequence of itelligence's breach of express and implied warranties, WCB sustained damages in an amount to be determined by the trier of fact.

## COUNT FIVE
## <u>ATTORNEYS' FEES & EXPENSES OF LITIGATION</u>

162. WCB repeats, realleges, and incorporates the allegations contained in Paragraphs 1 – 161 as if fully set forth herein.

163. With regard to the claims, transactions, acts, omissions and events referenced in the Amended Complaint, itelligence has acted in bad faith entitling WCB to recover itscosts and expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

## <u>PRAYER</u>

WHEREFORE, WCB respectfully requests that this Court enter judgment against itelligence and provide the following relief:

(1) Rescinding the parties' agreements, and awarding WCB restitution and special damages necessary to accomplish full justice and to restore WCB to the same position it was in prior to itelligence's fraud;

(2) In the alternative, awarding WCB actual, indirect, economic, consequential, and compensatory damages in an amount to be determined by the trier of fact;

(3) Restitution of all fees and expenses paid by WCB to itelligence;

(4) Awarding WCB punitive damages in an amount to be determined by the trier of fact;

(5) Awarding WCB for all costs of this action, including reasonable attorneys' fees and litigation expenses as provided for by law and pursuant to O.C.G.A. § 13-6-11;

(6) Awarding WCB pre-judgment and post-judgment interest at the highest rate(s) provided by law; and

(7)     Awarding WCB such other and further relief, at law and in equity, to which it

        may be entitled.

## JURY TRIAL DEMANDED

WCB hereby requests a trial by jury as to all claims in this action.

Dated: December 4, 2017

KASOWITZ BENSON TORRES LLP


By: s/ Andrew A. Davenport, Esq.
Mark P. Ressler (admitted *Pro Hac Vice*)
R. Tali Epstein (admitted *Pro Hac Vice*)
Andrew A. Davenport (GA Bar No. 205935)
Attorneys for Plaintiffs
Kasowitz Benson Torres LLP

1349 West Peachtree Street, N.W.
Suite 1500
Atlanta, Georgia 30309
Telephone: (404) 260-6106
Email:  adavenport@kasowitz.com

- and -

1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Email:  mressler@kasowitz.com
        tepstein@kasowitz.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the Amended Complaint will be served in accordance with and as provided for in Rule 4 of the Federal Rules of Civil Procedure.

Dated: December 4, 2017

KASOWITZ BENSON TORRES LLP

By: <u>s/ Andrew A. Davenport, Esq.</u>
Andrew A. Davenport (GA Bar No. 205935)

Kasowitz Benson Torres LLP
1349 West Peachtree Street, N.W.Suite 1500
Atlanta, Georgia 30309
Telephone: (404) 260-6106
Email:  adavenport@kasowitz.com