IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

W.C. BRADLEY CO.,                    *

    Plaintiff,                   *

vs.                                  *          CASE NO. 4:17-CV-208 (CDL)

ITELLIGENCE, INC.,                   *

    Defendant.                   *

_____

O R D E R

    Plaintiff W.C. Bradley Co. needed help with a major software
overhaul.  Defendant itelligence, Inc. told W.C. Bradley that it
had experienced consultants who could implement a software
solution that met W.C. Bradley's needs.  After extensive
negotiations, W.C. Bradley entered an agreement with itelligence
to implement the new software system.  Then the trouble began.
According to W.C. Bradley, it was a classic bait-and-switch:
although itelligence had knowledgeable personnel who said all the
right things during the sales process, the consultants who were
actually assigned to the project did not have the capability or
the expertise to implement the new software system successfully,
and itelligence's software solution was not sufficiently tailored
to meet W.C. Bradley's needs.  After the first major rollout of
the new software failed, W.C. Bradley made a list of grievances
and threatened to fire itelligence.  itelligence convinced W.C.
Bradley that it would fix the problems and get the project back

on track, so W.C. Bradley gave itelligence another shot.  The problems continued.  W.C. Bradley ultimately terminated the contract and brought this action alleging that itelligence fraudulently induced it to enter the initial agreement and committed additional fraud to keep W.C. Bradley from terminating the agreement.  W.C. Bradley seeks rescission of the agreement and damages resulting from itelligence's alleged fraud.  In the alternative, W.C. Bradley alleges that itelligence breached its contract with itelligence, including express warranties in that contract.  Presently pending before the Court is itelligence's motion for judgment on the pleadings as to W.C. Bradley's fraud, negligent misrepresentation, and certain express warranty claims.  As discussed below, that motion (ECF No. 33) is denied *except* as to W.C. Bradley's breach of express warranty claims set forth in paragraphs 158 and 159 of the Amended Complaint.

JUDGMENT ON THE PLEADINGS STANDARD

"Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001).  The Court "must accept the facts alleged in the complaint as true and view them in the light most favorable to the nonmoving party." *Id.*  The Court may consider written instruments attached to the complaint or answer in ruling on a motion for judgment on the pleadings without

converting that motion to a summary judgment motion under Federal Rule of Civil Procedure 12(d) because Rule 7(a) defines "pleadings" to include the complaint and answer, and Rule 10(c) provides that a copy of a written instrument "that is an exhibit to a pleading is a part thereof for all purposes." Fed. R. Civ. P. 10(c); *accord Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). If exhibits to a pleading "contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

FACTUAL ALLEGATIONS

W.C. Bradley alleges the following facts in support of its claims. The Court must accept these facts as true for purposes of the pending motion.

In 2014, W.C. Bradley decided to perform a global systems upgrade to replace its various business units' "disparate and aging" information technology systems with one integrated enterprise resource planning solution to provide a "single, consolidated view of operations and finances." Am. Compl. ¶¶ 2, 15-17, ECF No. 8. W.C. Bradley needed an enterprise resource planning system that could "provide dynamic business analytics and real-time reporting, accommodate multi-currency, multi-lingual, foreign tax, and other international regulatory requirements that are inherent in a global business operation."

*Id.* ¶ 17. W.C. Bradley recognized that the upgrade project would be complex and that its in-house information technology personnel could not complete the project on their own. Therefore, W.C. Bradley formed a selection team to investigate and document its business needs and search for available software solutions.

One software provider, SAP AG, recommended that W.C. Bradley partner with itelligence to design and implement a SAP system suitable for W.C. Bradley's business needs. W.C. Bradley had itelligence and other potential vendors demonstrate their software solutions to the selection team. And, itelligence had an opportunity "to participate in extensive information-gathering sessions" to understand W.C. Bradley's requirements for the enterprise resource planning solution. *Id.* ¶ 21. During those sessions, itelligence learned about W.C. Bradley's business processes, existing software, and IT personnel capabilities.

After the preliminary discovery sessions, W.C. Bradley issued a request for proposals inviting potential vendors to submit their plans for a global enterprise solution for W.C. Bradley. W.C. Bradley emphasized that it wanted an implementation partner that had proven abilities to implement enterprise solutions and retain experienced resources. itelligence submitted a proposal suggesting a SAP enterprise resource planning software solution. In its proposal, itelligence represented that its solution would exceed W.C.

Bradley's functional and technical requirements by meeting today's requirements and serving "as a flexible, scalable and stable platform for innovation and growth." *Id.* ¶ 25. itelligence also stated that it had "deep expertise" and "proven delivery methods" with SAP software products, as well as a "deep understanding of specific regional and local requirements." *Id.* ¶¶ 24-25. itelligence further represented that it would bring the "most qualified resources" with industry and SAP expertise to create an effective program on time and on budget. *Id.* ¶ 25. And, itelligence represented that it would deliver knowledge transfer and training to ensure that W.C. Bradley would be self-sufficient by the end of the project. *Id.* ¶ 26.

After analyzing the proposals it received, W.C. Bradley invited itelligence and two other vendors for an on-site demo day. itelligence "pre-sales" consultants demonstrated itelligence's SAP software solution. *Id.* ¶ 27. And, over the course of several months, itelligence representatives convinced the selection team that itelligence's global template solution would work for W.C. Bradley's business, that itelligence personnel had the skills and experience necessary to customize the SAP solution to meet W.C. Bradley's requirements, and that itelligence could deliver a SAP solution "with less effort and expense than competing . . . vendors through the use of a global template." *Id.* ¶¶ 4, 27. W.C. Bradley was concerned about the

price of the project, so itelligence proposed splitting the global implementation of the SAP solution into two phases. Phase I would include W.C. Bradley's corporate operations and two business units: Zebco Holdings and W.C. Bradley Real Estate. Phase Two would include the two remaining business units, Char-Broil, LLC and Lamplight Farms Inc. And, by the end of Phase I, itelligence would train W.C. Bradley's IT personnel so that they could lead the Phase II rollout at a significantly lower cost. *Id.* ¶¶ 4, 28.

W.C. Bradley asserts that when itelligence made these representations and proposals, it knew that W.C. Bradley really needed a solution tailored to meet its complex business requirements and that itelligence's pre-configured global template solution would not work for W.C. Bradley's business without significant customization, which would be upsold to W.C. Bradley at additional cost in terms of both money and time. W.C. Bradley further asserts that itelligence knew when it proposed the two-phase rollout plan that W.C. Bradley would not be able to implement Phase II on its own. And, W.C. Bradley contends that itelligence knew or should have known that its electronic data transfer tool was not capable of handling the data migration from W.C. Bradley's legacy software systems to the new SAP solution. But itelligence repeatedly assured W.C. Bradley in "dozens of conversations and written communications" that its template

solution and the two-phase rollout plan would work despite the significant differences between the business processes of W.C. Bradley's business units and the limitations of W.C. Bradley's IT personnel. *Id.* ¶¶ 6, 29-32.

Ultimately, itelligence presented an implementation services proposal to the W.C. Bradley selection team representing that Phase I of the project, which would roll out the SAP solution for Zebco and W.C. Bradley's corporate operations, would be done in 42 weeks and cost approximately $6 million. Phase II, which would cover Char-Broil and Lamplight, would be done in 24 weeks and cost approximately $475,000, with W.C. Bradley personnel having enough training and knowledge transfer from itelligence to lead Phase II.

When W.C. Bradley expressed concerns about the feasibility of the timeline and budget, itelligence represented that its program management methodology would ensure that the project would be successful. And when W.C. Bradley questioned whether W.C. Bradley personnel would be able to lead Phase II, itelligence assured W.C. Bradley that the work from Phase I would be reusable and that W.C. Bradley personnel would be able to lead Phase II with itelligence in a support role.

After considering the proposals from the vendor candidates, W.C. Bradley decided to use the SAP enterprise resource planning software platform because of its ability to provide immediate

business analytics in real time.  And, based on itelligence's representations and proposals regarding its SAP implementation skills, the feasibility of its global template solution, and its ability to provide local expert consultants at each of W.C. Bradley's international business locations, W.C. Bradley selected itelligence as the implementation vendor for the project.  On February 24, 2015, the parties entered a Master Services Agreement governing the terms under which itelligence would provide services on the project.  The Master Services Agreement was later amended, and the parties also executed multiple statements of work, change orders, and amendments regarding the specific services to be provided by itelligence on the project. The statements of work, change orders, and amendments issued under the Master Services Agreement were incorporated as part of the Master Services Agreement.  Def.'s Answer Ex. A, Master Services Agreement 1, ECF No. 19-1.  The Master Services Agreement provided that itelligence's services would be provided on a time and materials basis unless the applicable statement of work provided for a fixed fee.  *Id.* §§ 3.4-3.5.  It also provided a "good faith estimate of itelligence time and materials" for the project.  *Id.* § 1.3 & Ex. A.  It contained an "exclusive warranties" provision.  *Id.* § 9.  Finally, the Master Services Agreement stated that it constituted the complete agreement between the parties and superseded all proposals, discussions,

and negotiations prior to the execution of the agreement. *Id.* § 25.

Phase I of the project officially began in March 2015. By October 2015, the two-phase rollout itelligence sold to W.C. Bradley turned into an eight-phase rollout. The first rollout was to Zebco's non-U.K. European operations. It did not go well. Printers and business forms did not work; invoices were incorrectly translated, did not reflect the correct discounts, and violated E.U. tax requirements; electronic data interchange "was a complete failure" that required W.C. Bradley to perform its inventory manually; and interfaces between the new SAP system and the legacy systems did not work. Am. Compl. ¶ 98. And, itelligence billed W.C. Bradley for the cost of fixing its own mistakes.

After the Zebco EU rollout failure, W.C. Bradley sent itelligence a Notice of Material Breach on May 9, 2016. Def.'s Answer Ex. I, Letter from D. Freeman to T. Breen (May 9, 2016), ECF No. 19-84. The letter demanded that itelligence "cure its breaches under the [Master Services Agreement] and misrepresentations within 30 days." *Id.* at 1. Those breaches and misrepresentations included failure to properly implement the Zebco EU project; failure to provide consultants who had the requisite experience for the project and understood W.C. Bradley's business requirements; failure to use IT professionals

who could implement the electronic data interchange and electronic warehouse management; failure to point out that SAP security functionality would cost extra; and problems with data migration. In response, itelligence acknowledged that some of its electronic data interchange resources were not up to the task; that it was not aware of SAP's new electronic warehouse management release at the time of contracting; that it inadvertently omitted the SAP security piece from a statement of work; and that there were some "post implementation issues." Def.'s Answer Ex. J, Letter from T. Breen to D. Freeman (May 19, 2016), ECF No. 19-85. itelligence disagreed with the rest of W.C. Bradley's claims. itelligence proposed a remediation plan to fix the problems and keep W.C. Bradley's business. In the remediation plan, itelligence acknowledged that it had issues with "[r]esource churn" and "resource quality" and that it underestimated the complexity of W.C. Bradley's businesses. Am. Compl. ¶ 100. In the remediation plan, itelligence proposed a revised budget with some discounts but an overall increase in cost, committed to assigning solution architects that understood W.C. Bradley's business requirements, and agreed to engage additional vendors with the expertise necessary to complete the project. The remediation plan also stated that W.C. Bradley would be able to lead the Char-Broil and Lamplight rollouts, with itelligence in a supporting role.

After receiving the remediation plan, W.C. Bradley's chief information officer and chief financial officer met with itelligence executives to discuss the past problems and a possible way forward. itelligence convinced W.C. Bradley that it would be able to deliver the project despite the past failures, and the parties renegotiated the contract for Phase I. The amended contract provided for fixed fee payments based on the achievement of milestones rather than payment based on time and materials, and it transferred part of the scope of work from itelligence to third-party vendors.

Based on the amended Master Services Agreement, the project continued. The parties agreed to new statements of work, amendments to existing statements of work, and various change orders. W.C. Bradley also signed off on the completion of several project deliverables and continued to make payments to itelligence. After the amendment, there was a small rollout of the system for W.C. Bradley's corporate and real estate operations. The next rollout, for Zebco North America, was in November 2016. Like the rollout for Zebco EU, it did not go well. There were problems with forecasting data, and the system "completely lacked any reporting." Am. Compl. ¶ 102. itelligence billed W.C. Bradley to fix these problems. Despite the problems, W.C. Bradley did sign off on and make payments for several deliverables related to the Zebco North America rollout.

W.C. Bradley evaluated the overall project and determined that Phase II needed to be re-scoped and that the timeline had to be extended. itelligence repeatedly assured W.C. Bradley that it "would make the necessary changes to salvage the Project." *Id.* ¶ 103. In June 2017, W.C. Bradley required itelligence to make a presentation to W.C. Bradley's senior leadership. During that meeting, itelligence admitted that the original timeline and budget were not feasible and that it did not have warehouse management skills that were critical to the project. itelligence offered to change project managers again and also offered another mitigation plan. But W.C. Bradley hired a third-party software firm to audit the project, and the auditor's preliminary investigation concluded that itelligence had materially breached the parties' contract. It also suggested that itelligence "had knowingly and/or recklessly made false representations about" its "skills and expertise," the project's timeframe, and "the appropriateness of a global template solution." *Id.* ¶ 121.

On September 29, 2017, W.C. Bradley sent itelligence another Notice of Material Breach and demanded that itelligence cease work on the project so that W.C. Bradley could complete the audit and determine the appropriate course of action. And on October 20, 2017, after the auditor concluded its preliminary investigation, W.C. Bradley delivered a notice of rescission to itelligence.

W.C. Bradley has paid itelligence more than $20 million for a project that was originally supposed to cost $6.5 million. W.C. Bradley has also paid third-party vendors to fix problems with the system, and its own employees have spent thousands of hours to implement the new system. The system, which was supposed to be up and running for all business units by mid-2016, has not yet been implemented for several business units. The part of the project that has been implemented does not fully meet W.C. Bradley's business requirements. Nonetheless, the new systems have become "crucially entwined" with W.C. Bradley's business operations, and it would cause W.C. Bradley "significant hardship" to try to disentangle the new system and return it to itelligence. *Id.* ¶ 123. And, according to W.C. Bradley, the systems "present no value or use to itelligence." *Id.* W.C. Bradley contends that under these circumstances, it would be "impractical, unreasonable, and inequitable" to require W.C. Bradley to tender the system back to itelligence. *Id.*

W.C. Bradley brings a claim for fraud, fraudulent inducement, and deceit. W.C. Bradley contends that itelligence knowingly made material misrepresentations and concealed material facts about its ability to deliver the project. W.C. Bradley relied on these misrepresentations and omissions and entered the agreement with itelligence. Then, when the problems began and W.C. Bradley threatened to end the project, itelligence made

additional material misrepresentations and concealed additional material facts. W.C. Bradley relied on these additional misrepresentations and omissions and continued the project until additional project failures and a software audit revealed that the project was not salvageable.

In the alternative, W.C. Bradley asserts breach of contract and breach of express warranty claims and alleges that itelligence breached the parties' contract in more than twenty ways.[1] *See id.* ¶ 43. In a nutshell, W.C. Bradley contends itelligence did not adequately plan for the project or provide the right people for the project, which resulted in work product that did not meet W.C. Bradley's business needs despite being significantly over time and over budget.

DISCUSSION

itelligence seeks judgment on the pleadings on W.C. Bradley's fraud claims and two of its express warranty claims. itelligence's central argument is that W.C. Bradley waived its right to rescind the contract and instead affirmed the contract, so W.C. Bradley's only recourse is to sue under the contract and not in tort.

## I.  Did **W.C. Bradley Waive its Claim for Rescission?**

W.C. Bradley alleges that it was fraudulently induced into entering the contract with itelligence. Therefore, W.C. Bradley

---

[1] W.C. Bradley also brought a claim for breach of implied warranty, but it withdrew that claim.

has "two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." *Mitchell v. Backus Cadillac—Pontiac, Inc.*, 618 S.E.2d 87, 92 (Ga. Ct. App. 2005) (quoting *Brown v. Garrett*, 584 S.E.2d 48, 49 (Ga. Ct. App. 2003)). itelligence argues that the pleadings establish as a matter of law that W.C. Bradley affirmed its agreement with itelligence instead of promptly rescinding it once it discovered the alleged fraud. They do not.

A plaintiff seeking to rescind due to fraud must do so "promptly" after discovering the fraud. O.C.G.A. § 13-4-60. If a "defrauded party, 'with knowledge of the fraud, does an act in ratifying or affirming the contract which shows his intention to abide by the contract as made, with the fraud in it, and thus waives the fraud,'" he cannot rescind the contract and sue in tort. *Nalley v. Langdale*, 734 S.E.2d 908, 918 (Ga. Ct. App. 2012) (quoting *Tuttle v. Stovall*, 67 S.E. 806, 808 (Ga. 1910)). And, Georgia law requires that a party act "with that promptitude which the nature of the case and environment of the circumstances would require." *Newton v. Burks*, 229 S.E.2d 94, 95 (Ga. Ct. App. 1976) (quoting *Jordy v. Dunlevie*, 77 S.E. 162, 165 (Ga. 1913)). The question whether a party waived its right to rescind by electing to ratify a contract instead of promptly seeking rescission is highly fact-specific, so it is ordinarily a

question for the jury. *Id.* at 96; *accord Nalley*, 734 S.E.2d at 918 (stating that the question whether "a ratification has occurred 'is usually a fact question for the jury'" (quoting *Brock v. Yale Mtg. Corp.*, 700 S.E.2d 583, 588 (Ga. 2010))). The Court can only decide these issues as a matter of law if "the facts and circumstances essential to the waiver issue are clearly established." *Denim N. Am. Holdings, LLC v. Swift Textiles, LLC*, 532 F. App'x 853, 859 (11th Cir. 2013) (quoting *Forsyth Cty. v. Waterscape Servs., LLC*, 694 S.E.2d 102, 110 (Ga. Ct. App. 2010)).[2]

Here, itelligence argues that it is clear from the allegations in the Amended Complaint and from W.C. Bradley's May 2016 letter that W.C. Bradley was on notice of itelligence's fraud but elected to affirm the contract. The Court must view the allegations in the Amended Complaint in the light most

_____

[2] In the cases itelligence relies on, it was clear that the party seeking rescission knew about the fraud but did not promptly rescind. For example, in *Swift Textiles*, the evidence at trial established that the plaintiff was aware of the defendants' fraud and demanded rescission of the parties' contract but then invoked a provision of that contract to request and receive a capital contribution from the defendant—an act incompatible with contract rescission. *Swift Textiles*, 532 F. App'x at 859. Therefore, the waiver issue could be decided on a motion for judgment as a matter of law. Similarly, in *Orion Capital Partners, L.P. v. Westinghouse Electric Corp.*, 478 S.E.2d 382 (Ga. Ct. App. 1996), the buyer of a pet food business discovered immediately after the sale that the pet food was mislabeled and that the business was not being conducted lawfully, contrary to the seller's representations. Instead of rescinding promptly after discovering this fraud, the buyer continued to operate the business and spent months trying to fix the problems. *Id.* at 385. And in *Holloman v. D.R. Horton, Inc.*, 524 S.E.2d 790 (Ga. Ct. App. 1999), the home buyers found significant defects in their home and requested repairs under the contract. Three months later, they sent a rescission letter. But then they filed a complaint affirming the contract and seeking damages and did not seek rescission. Thus, the home buyers waived their right to seek rescission. *Id.* at 795-96.

favorable to W.C. Bradley at this stage of the proceedings. In that light, the Amended Complaint establishes that by May 2016, W.C. Bradley was dissatisfied with the Zebco EU project due to a number of problems during the implementation. The Amended Complaint also establishes that W.C. Bradley found some of itelligence's consultants lacking in terms of their past experience and their understanding of W.C. Bradley's business requirements. But nothing in the pleadings, viewed in the light most favorable to W.C. Bradley, suggests that W.C. Bradley knew or should have known about the fraud W.C. Bradley now alleges: (1) that itelligence sold W.C. Bradley on a global template solution knowing that the system would not work for W.C. Bradley's business and that after itelligence got in the door with its "cost effective" global template plan, it could get W.C. Bradley to spend millions of dollars on customizations that were necessary to make the software work; (2) that itelligence lied about its experience and capabilities; and (3) that itelligence's estimates regarding the length and cost of the project were not in good faith. W.C. Bradley asserts that it did not learn about this alleged fraud until more than a year later, when the software auditor completed its preliminary investigation and concluded that itelligence had knowingly or recklessly made false representations about its skills, the project's timeframe, and the feasibility of using a global template solution. Therefore,

the present record does not establish, as a matter of law, that W.C. Bradley acted with knowledge of itelligence's alleged fraud when it accepted itelligence's remediation plan. And, W.C. Bradley sufficiently alleges that it did not discover itelligence's alleged fraud until September 2017, shortly before it sent the October 2017 rescission letter.

Furthermore, the present record does not establish, as a matter of law, that W.C. Bradley acquiesced in any of the breaches or misrepresentations it knew about or suspected as of May 2016. Rather, the Amended Complaint and the May 9, 2016 letter suggest that W.C. Bradley insisted that the project would terminate and itelligence would be fired unless itelligence fixed the software problems and made a number of staffing and other changes for future project phases. W.C. Bradley further alleges that in response to its concerns and to keep from losing the business, itelligence made additional misrepresentations to lure W.C. Bradley into a new agreement with a remediation plan that promised to fix the problems W.C. Bradley raised and get the project back on track. For all of these reasons, the allegations of the Amended Complaint do not establish, as a matter of law, that W.C. Bradley's acceptance of the remediation plan in May 2016 amounted to a waiver of itelligence's fraud such that rescission is no longer an available remedy.

## II. Is W.C. Bradley's Fraudulent Inducement Claim Barred?

Relying on its argument that W.C. Bradley waived its right to rescind, itelligence asserts that the contract's merger clause bars W.C. Bradley's fraudulent inducement claim. The agreement between W.C. Bradley and itelligence contained an "entire agreement" clause stating that it constituted the complete agreement between the parties and superseded all proposals, discussions, and negotiations prior to the execution of the agreement. Normally, an entire agreement clause like this one estops a party *who elects to affirm a contract* from claiming that the other party's extra-contractual misrepresentations fraudulently induced him to enter the contract. *See, e.g.*, *Browning v. Stocks*, 595 S.E.2d 642, 644 (Ga. Ct. App. 2004) (en banc) (finding that homebuyers who affirmed contract were estopped from making fraudulent inducement claim based on *misrepresentations* about the house but concluding that they still had a fraudulent inducement claim based on *fraudulent concealment* of termite damage). The rationale behind this rule is that an essential element of a fraud claim is justifiable reliance; if a contract contains a merger clause, then a party cannot argue that he relied on representations other than those in the contract. But a party who validly seeks rescission of the contract is not bound by the merger clause. *See, e.g.*, *Conway v. Romarion*, 557 S.E.2d 54, 58 (Ga. Ct. App. 2001) (noting that homebuyers were

not bound by the merger clause in the purchase and sale agreement in asserting their claim for rescission based on fraudulent inducement). As discussed above, itelligence is not entitled to judgment on the pleadings on W.C. Bradley's claim for rescission, so the fraudulent inducement claim is not barred by the merger clause at this time.

**III. Does the Economic Loss Rule Bar W.C. Bradley's Tort Claims?**

Also relying on its argument that W.C. Bradley waived its right to rescind, itelligence contends that W.C. Bradley's tort claims are all barred by the economic loss rule. The economic loss rule, which originated in the product liability context, "generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort." *ASC Const. Equip. USA, Inc. v. City Commercial Real Estate, Inc.*, 693 S.E.2d 559, 566 (Ga. Ct. App. 2010) (quoting *City of Cairo v. Hightower Consulting Eng'rs*, 629 S.E.2d 518, 525 (Ga. Ct. App. 2006)). Under this rule, a mere failure to perform under a contract does not give rise to a tort claim. But if the party validly rescinds a contract, "in legal contemplation, there is no contract between the parties." *City Dodge, Inc. v. Gardner*, 208 S.E.2d 794, 798 (Ga. 1974). As discussed above, itelligence is not entitled to judgment on the pleadings on W.C. Bradley's claim for rescission, so W.C. Bradley's tort claims are not barred by the economic loss doctrine at this time.

## IV.  Warranty Claims

Finally, itelligence seeks dismissal of W.C. Bradley's alternative breach of express warranty claims that are set forth in paragraphs 158 and 159 of the Amended Complaint.[3]  itelligence argues that these claims are barred because of the warranty disclaimer in the Master Services Agreement.  In paragraph 158, W.C. Bradley alleges that itelligence "warranted to provide the Project with team members 'who are skilled and trained as SAP consultants.'"  Am. Compl. ¶ 158.  In paragraph 159, W.C. Bradley alleges that "itelligence also made various express . . . warranties in the Agreement as to the quality, performance, cost, design, integration, and consulting services it contracted to provide to" W.C. Bradley.  *Id.* ¶ 159.  itelligence argues that these express warranty claims are barred because they were expressly disclaimed.

The Master Services Agreement contained an "exclusive warranties" provision.  itelligence warranted that its work product would work in conformance with its documentation and that itelligence had license rights to the software.  Master Services Agreement § 9.1.  itelligence further warranted that it would provide the services "in a good and workmanlike manner using the highest industry commercial practices and standards."  *Id.* § 9.2.

_____

[3] itelligence does not seek dismissal of the breach of express warranty claims set forth in paragraphs 156 and 157 of the Amended Complaint because they parallel the express warranties provided for in the Master Services Agreement.

itelligence also warranted that if the work product failed to perform as promised in § 9.1 and § 9.2, itelligence would repair or replace it or, if that was not possible, issue a refund for that work product. *Id.* § 9.3. Both parties warranted that they had authority to enter the agreement. *Id.* § 9.4. The Master Services Agreement also had a warranty disclaimer: the warranties set forth in §§ 9.1 to 9.4 are the "exclusive warranties of itelligence regarding its services and work product," and itelligence "makes no other warranties or guarantees to" W.C. Bradley, "whether express or implied." *Id.* § 9.5 (emphasis omitted).

In its response to itelligence's motion for judgment on the pleadings, W.C. Bradley asserted that the warranty alleged in Paragraph 158 was made in the "Building Block" statement of work and that the warranties alleged in Paragraph 159 were made in unspecified statements of work and change orders. But the Building Block statement of work and all other statements of work were issued under the terms and conditions of the Master Services Agreement, which explicitly disclaims all warranties that are not set forth in that agreement. The Court thus finds that itelliegence is entitled to judgment as a matter of law on the breach of express warranty claims set forth in paragraphs 158 and 159 of the Amended Complaint.

## CONCLUSION

For the reasons set forth above, the Court denies itelligence's motion for judgment on the pleadings (ECF No. 33) *except* as to W.C. Bradley's breach of express warranty claims set forth in paragraphs 158 and 159 of the Amended Complaint. itelligence's motion for judgment on the pleadings as to those two express warranty claims is granted.

IT IS SO ORDERED, this 12th day of June, 2018.

S/Clay D. Land
_____
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA